308 F.3d 939
 Christopher Todd BROWN, Plaintiff-Appellant,
v.
Charles LI, in his individual and official capacity as Dean, Graduate Division, University of California Santa Barbara; Henry Yang, in his individual and official capacity as Chancellor, University of California Santa Barbara; Galen Stucky, in his individual and official capacity as Professor of Chemistry and Materials, University of California Santa Barbara; Daniel E. Morse, in his individual capacity and in his official capacity as Professor of Molecular Genetics and Biochemistry, University of California Santa Barbara; Fred Lange, in his individual and official capacity as Chair of the Materials Department, University of California Santa Barbara; Sarah Pritchard, in her official capacity as Director of the Davidson Library, University of California Santa Barbara, Defendants-Appellees.
 No. 01-55930.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 9, 2002.
 Filed August 12, 2002.
 Amended October 24, 2002.
 
 COPYRIGHT MATERIAL OMITTED Paul L. Hoffman, Schonbrun Desimone Seplow Harris & Hoffman, LLP, Venice, California; and Penelope Glass, Law Offices of Penelope Glass, Los Angeles, CA, for the plaintiff-appellant.
 Christopher M. Patti, Office of the General Counsel, The Regents of the University of California, Oakland, CA, for the defendants-appellees.
 Kevin M. Brennan, Arnold & Porter, New York, NY, for the amicus curiae.
 Appeal from the United States District Court for the Central District of California; Ronald S.W. Lew, District Judge, Presiding. D.C. No. CV-00-06492-RSWL.
 Before: FERGUSON, REINHARDT, and GRABER, Circuit Judges.
 
 
 1
 Opinion by Judge GRABER; Concurrence by Judge FERGUSON; Partial Concurrence and Partial Dissent by Judge REINHARDT.
 
 ORDER
 
 2
 The mandate is recalled for the limited purpose of correcting the caption. The Opinion filed on August 12, 2002, is amended as follows:
 
 
 3
 On slip opinion page 11773 [299 F.3d 1092], in the caption after "CHARLES LI, in his" insert "individual and" so it reads, "CHARLES LI, in his individual and official capacity as Dean."
 
 
 4
 On slip opinion page 11773 [299 F.3d at 1092], in the caption after "GALEN STUCKY," change "Material" to "Materials."
 
 
 5
 On slip opinion page 11773 [299 F.3d at 1092], in the caption after "SARAH PRITCHARD," delete "in her individual and" so it reads, "SARAH PRITCHARD, in her official capacity as Director."
 
 
 6
 The mandate shall reissue forthwith.
 
 OPINION
 
 7
 GRABER, Circuit Judge.
 
 
 8
 In this appeal, we consider the extent to which the First Amendment and due process guarantees are implicated when a graduate student's thesis committee declines to approve a thesis that meets academic and professional standards in all respects except one: The acknowledgments section does not conform to established academic and professional standards. We conclude that the Amendment does not require university professors to assign a passing grade to such a thesis. We further hold that the university's review procedures satisfied due process. Accordingly, we affirm the district court's grant of summary judgment in favor of Defendants, who are university professors and officials. However, we remand the case for the district court to address a state constitutional claim that it did not resolve.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 9
 Plaintiff Christopher Brown was a master's degree candidate in the Department of Material Sciences at the University of California at Santa Barbara ("UCSB"), a public university. In order to earn a master's degree, Plaintiff was required to write a thesis under the guidance and subject to the approval of his thesis committee: Defendants Dr. Galen Stucky (Plaintiff's thesis advisor), Dr. Daniel Morse, and Dr. Fred Lange.
 
 
 10
 Rules governing the content and structure of master's theses, and the procedures for submitting those theses for approval, are contained in UCSB's Graduate Student's Handbook 1998-99 (Sept.1998) ("Handbook") and in the UCSB Guide to Filing Theses and Dissertations (Feb.1998) ("Guide"). The Guide notes that one of the pedagogical purposes of the thesis project is to educate students about how to communicate research results in their chosen disciplines: "The essence of academic research is shared results. Each discipline has a relatively standard method of presenting research results so that other researchers can find and build on past work." Guide at 1. With respect to the content of a thesis or dissertation, the Guide states:
 
 
 11
 You and your committee are responsible for everything between the margins. The organization, presentation, and documentation of your research should meet the standards for publishing journal articles or monographs in your field. For general information, consult any standard style guide (such as Strunk and White, Turabian, or The University of Chicago Manual of Style). For discipline-specific questions, consult your faculty committee and/or a style sheet from a journal in your discipline.
 
 
 12
 Id. (emphasis added).
 
 
 13
 The Guide also provides the general criteria for an optional "Dedication and/or Acknowledgments" section of a student thesis: "You may wish to dedicate this work to someone special to you or to acknowledge particular persons who helped you. Within the usual margin restrictions, any format is acceptable for these pages."
 
 
 14
 One of the style manuals to which the Guide refers further clarifies the criteria for acknowledgments sections contained in scholarly papers. See Kate L. Turabian, A Manual for Writers of Term Papers, Theses, and Dissertations §§ 1.9, 1.26 (Univ. of Chi. Press, 6th ed.1996). With respect to acknowledgments, it states:
 
 
 15
 In the acknowledgments, the writer thanks mentors and colleagues, lists the individuals or institutions that supported the research, and gives credit to works cited in the text for which permission to reproduce has been granted. Although one might wish to acknowledge special assistance such as consultation on technical matters or aid in securing special equipment and source materials, one may properly omit formal thanks for the routine help given by an adviser or thesis committee. The generic heading ACKNOWLEDGMENTS, which appears only on the first page, is in uppercase and centered over the text.
 
 Id. § 1.26.[1]
 
 16
 The Handbook elaborates further on the supervisory role of the thesis committee with respect to the content of a master's thesis:
 
 
 17
 Students, in conjunction with the faculty who supervise the writing of the dissertation, are responsible for the quality of scholarship in theses and dissertations, including presentation in a format that conforms to disciplinary standards. Faculty should not approve a dissertation that fails to address disciplinary and/or departmental standards.
 
 
 18
 Handbook at 12 (emphasis added).
 
 
 19
 In the spring of 1999, Plaintiff brought his thesis, "The Morphology of Calcium Carbonate: Factors Affecting Crystal Shape," to his committee for final approval. Plaintiff did not include an acknowledgments section of any kind in the document that he delivered to his committee. All three committee members signed an approval page stating, "This Thesis of Christopher Brown is approved." (Emphasis added.) In accordance with UCSB rules, that approval page became the second page of the thesis.
 
 
 20
 After he had obtained the signature page from his committee, Plaintiff inserted an additional, two-page section into his thesis without the knowledge or consent of his committee members. That section, entitled "Disacknowledgements," began: "I would like to offer special Fuck You's to the following degenerates for of being an ever-present hindrance during my graduate career...." It then identified the Dean and staff of the UCSB graduate school, the managers of Davidson Library, former California Governor Wilson, the Regents of the University of California, and "Science" as having been particularly obstructive to Plaintiff's progress toward his graduate degree. Plaintiff later explained that he had not revealed the section to the members of his committee because he feared that they would not approve it.
 
 
 21
 UCSB rules require that graduate students file their approved theses or dissertations in the university's library as a prerequisite to earning a degree. In June of 1999, Plaintiff attempted to file his thesis, including the unapproved "Disacknowledgements" section, with the library. Defendant Charles Li, the Dean of the Graduate Division of UCSB, was alerted to the presence of the "Disacknowledgements." Dean Li, in turn, referred the issue to Plaintiff's thesis committee.
 
 
 22
 During June and July, Plaintiff met with members of his committee and with Dean Li to discuss the "Disacknowledgements." He also met with the UCSB Ombudsperson and with the Dean of the UCSB School of Engineering. Plaintiff drafted an alternative version of the section, eliminating the profanity.
 
 
 23
 The committee members agreed that the "Disacknowledgements" section (even in its nonprofane form) did not meet professional standards for publication in the field. They notified Plaintiff of their decision in a memorandum dated August 5, 1999. That memorandum, written by Dr. Stucky, read in part:
 
 
 24
 1) The Dissertation Committee stands by its approval of the thesis (dissertation) as it was presented by you to the Committee for their evaluation, review and approval; and, subsequently signed by the members of the Dissertation Committee.
 
 
 25
 2) The disacknowledgement was not submitted to the Dissertation Committee or to the Graduate Division of the University of California, but for deposition in the Library without knowledge of either the Dissertation Committee or the Graduate Division. It is the understanding of the Dissertation Committee members who reviewed your thesis that the signatures of the Dissertation Committee members are a guarantee that the presentation and content of the entire thesis meets the standards and requirements of the Department, College, and the University of California to whom the thesis is submitted for the appropriate advanced degree. The addition or removal of material from a dissertation after the examination, evaluation and signed approval of the original materials that are presented by the candidate to the Committee; and, the subsequent presentation to the scientific community and to the University of such a modified dissertation under the approval signatures of the Committee given only for the original Dissertation presentation to the Committee without the consent of the Committee for the addition or removal of material, is unacceptable to the Committee.
 
 
 26
 In the August 5 memorandum, the committee also commented that it had consulted with counsel and determined that a thesis or other scientific manuscript is not a "public forum." The committee further said that it would not approve the addition of the "added material[s]" to the original, approved thesis, nor would it approve a thesis that contained them.
 
 
 27
 On the same date, Dean Li wrote a letter to Plaintiff, informing him that his degree would be conferred upon the approval of his thesis. The letter further noted that approval would be forthcoming as soon as Plaintiff removed his "Disacknowledgements." It outlined Plaintiff's avenues of appeal, should he opt to challenge the committee's decision not to approve the new version of the thesis.
 
 
 28
 Plaintiff declined to remove the "Disacknowledgements." Instead, he submitted a written appeal to the Academic Affairs Committee (AAC) of the Department of Material Sciences. The AAC considered Plaintiff's appeal and unanimously rejected it in a written decision. The AAC reasoned that the entire paper, not merely the technical content of the thesis, was subject to the review and approval of the thesis committee — just as the entirety of a scientific paper would be subject to the review and approval of the editorial board of any publication to which it was submitted. The AAC articulated the standard for an acknowledgment section:
 
 
 29
 An Acknowledgment section in a scientific paper is relevant only as a vehicle for the author to give proper credit to people or organizations that have contributed to make possible the technical work being reported. In the case of a thesis this could include faculty, post-docs, fellow students, and laboratory staff who have helped the student with ideas, setting up experiments, clarifying difficult questions, etc. A student is also expected to thank the agency that has provided funding for his/her assistantship and research expenditures. Under the same premise, the student is given a certain latitude in a thesis to thank his/her parents, spouse, family or close friends who have provided moral or financial support through his/her education. The student is encouraged to have an Acknowledgment section as part of teaching him/her proper professional conduct.
 
 
 30
 The AAC determined that Plaintiff's "Disacknowledgements" did not meet that standard. It concluded that the section was otherwise irrelevant to the content of his thesis. The AAC reminded Plaintiff that several other avenues were open to him for disseminating the opinions contained in the "Disacknowledgements" and observed that it was common in the field for "technical material removed from a paper on the ground of irrelevancy to be published separately." The decision additionally noted the rights of the committee members not to be associated, through their approval, with the content of the "Disacknowledgements" section. Finally, the AAC commented that Plaintiff's conduct was unprofessional in later inserting the material into his thesis without the knowledge or approval of his thesis committee.
 
 
 31
 Plaintiff appealed the AAC's decision to the Associate Dean of the Graduate Division, Diane Mackie. After reviewing the file, Dean Mackie denied the appeal.
 
 
 32
 Next, Plaintiff appealed to the UCSB Graduate Council, to which he submitted extensive written material. The Graduate Council rejected Plaintiff's appeal in a written decision. It reasoned that, under the university's regulations, the entirety of Plaintiff's thesis was subject to the approval of his thesis committee, and the "committee members [were] within their rights to withdraw their approval, as they do not approve of your added section." The Graduate Council additionally found that Plaintiff had been denied a degree only because he had not completed one of the prerequisites to completing a master's degree: filing a thesis approved by the committee. The Graduate Council suggested two ways in which Plaintiff could complete his degree:
 
 
 33
 1) seek approval of your entire thesis from your current committee, including the content of any acknowledgements/dedication section. All sections of your thesis are subject to their editing and approval.
 
 
 34
 or.
 
 
 35
 2) seek to change the membership of the committee, subject to the approval of your department and the Graduate Division and appropriate university regulations. Submit your complete thesis with the new committee and meet all editing or research requirements imposed by that committee.
 
 
 36
 Plaintiff chose not to pursue either option proposed by the Graduate Council. Instead, he filed a grievance with the Academic Freedom Committee (AFC). He presented his case orally to the Chair of the AFC and in writing to the full AFC. The AFC rejected his grievance. It reasoned that the rules for filing theses did not impermissibly restrict academic freedom and that Plaintiff had failed to follow those rules.
 
 
 37
 By January 2000, Plaintiff had exceeded the time limit for completing his master's degree and was, therefore, placed on academic probation in accordance with pre-existing UCSB policy. Dean Li notified Plaintiff that if he failed to complete his degree by the end of the Spring Quarter of 2000, then the Department of Material Sciences would be asked to recommend either academic disqualification or continued academic probation. On April 18, 2000, near the end of Spring Quarter, Dean Li sent a memorandum to the Department, asking for its recommendation as to Plaintiff's academic status. On May 16, 2000, the Department recommended that Plaintiff receive his degree, based on the draft of the thesis that had received approval, despite Plaintiff's failure to comply with the requirements for earning his degree. UCSB followed the recommendation and awarded Plaintiff his degree. However, because Plaintiff has not filed the approved version of his thesis with the UCSB library, the thesis has not been added to the library's archive of theses.
 
 
 38
 Plaintiff initiated this § 1983 action on June 16, 2000. His complaint alleged three claims: (1) that Defendants (the Dean of the UCSB Graduate Division, the Chancellor of UCSB, the members of Plaintiff's thesis committee, and the Director of the UCSB library) violated his First Amendment rights by "withholding" his degree and by their "conduct"; (2) that Defendants violated his right to procedural due process by withholding his degree without having provided him a formal hearing; and (3) that Defendants' refusal to grant his degree unless he removed the "Disacknowledgements" violated article I, section 2, of the California Constitution. Plaintiff sought damages, declaratory relief, and an injunction to compel Defendants to place Plaintiff's thesis, including the "Disacknowledgements," in the UCSB library.
 
 
 39
 Defendants moved for summary judgment on the federal claims. They argued that they were entitled to qualified immunity on the damages claims and that Plaintiff was not entitled to injunctive relief. The court permitted Plaintiff to conduct limited discovery.
 
 
 40
 After discovery, Plaintiff filed a memorandum in opposition to summary judgment. He attached, as an exhibit to the memorandum, several other students' acknowledgments sections approved by UCSB faculty, including three approved by Defendant Stucky. None were approved by any other members of Plaintiff's thesis committee. All of those acknowledgments sections conveyed thanks to various people and institutions, sometimes in profuse, humorous, or poetic form. In addition to thanking teachers, colleagues, family, friends, staff, employers, the university, and sources of grants or other support, some students thanked God for providing guidance or thanked their pets. The three sections approved by Dr. Stucky included (1) a three-page section describing how the student came to arrive at graduate school; thanking his grandfather, professors, staff, co-researchers, and "[o]ther chemists in the Stucky group that have given valuable input"; and endorsing certain products; plus a half-page of "negative statement[s]" related to the inferior state of the chemists' facilities and to a flood that ruined some of the student's files; plus a dedication page honoring "my family and friends who have died since I began my college career" and with whom the student "would have liked ... to share this moment"; (2) a five-page section thanking many professors, scientists, friends, supervisors, colleagues, graduate students, a summer assistant, collaborators, "influential people in the zeolite field," the staff of the Materials Research Laboratory, family, and friends; plus a dedication page honoring the student's wife for "her support, encouragement, and love" and his daughter for her "smiles and hugs"; (3) a one-page section thanking the student's professors and colleagues, his parents, and a friend; plus a dedication page honoring his wife "for all of her love and understanding."
 
 
 41
 After holding a hearing, the court granted summary judgment in favor of Defendants. Plaintiff timely appealed.
 
 STANDARD OF REVIEW
 
 42
 We review de novo a grant of summary judgment. Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir.1998). Viewing the evidence in the light most favorable to the nonmoving party, we must decide whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. Id.
 
 DISCUSSION
 
 43
 A. Qualified Immunity on the First Amendment Claim
 
 
 44
 We apply a three-step test to determine whether a defendant is entitled to qualified immunity on a federal constitutional claim. First, we must determine whether the facts alleged, viewed in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a constitutional right. Robinson v. Solano County, 278 F.3d 1007, 1012-13 (9th Cir.2002) (en banc) (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Next, if the facts alleged show a constitutional violation, we must decide whether the constitutional right at stake was clearly established at the time of the alleged violation. Id. Finally, if the right was clearly established, we assess whether an objectively reasonable government actor would have known that his or her conduct violated the plaintiff's constitutional right. Id.
 
 
 45
 Plaintiff primarily contends that the facts, viewed in his favor, demonstrate a violation of his clearly established First Amendment rights. He challenges three acts: (1) the thesis committee's decision not to approve his "Disacknowledgements"; (2) the library's decision not to file his thesis in its archives; and (3) the UCSB's initial decision not to confer his degree.
 
 
 46
 Plaintiff cannot state separate First Amendment claims with respect to the second and third decisions. Under UCSB's policy, each of those two decisions was nondiscretionary, that is, turned completely on the committee's decision whether to approve the thesis. Had the committee approved the "Disacknowledgements" section, the library would have had to file the thesis containing it. The library had no independent authority to decide whether or not to include the thesis in its collection. Likewise, had Plaintiff filed an approved thesis with the library, UCSB would not have had discretion to decide to withhold or defer the degree.[2]
 
 
 47
 Because the decisions not to place the thesis in the library and to delay granting Plaintiff's degree were not independent decisions but, rather, were direct consequences of the committee's decision not to approve the "Disacknowledgements," the real question is whether Defendants violated Plaintiff's First Amendment rights when they refused to approve that section. We have found no precedent precisely on point. However, a review of the cases discussing the relationship between students' free speech rights and schools' power to regulate the content of curriculum demonstrates that educators can, consistent with the First Amendment, restrict student speech provided that the limitation is reasonably related to a legitimate pedagogical purpose.
 
 
 48
 In Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 276, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Supreme Court of the United States held that school officials did not violate students' First Amendment rights when they prohibited the publication in the school newspaper of stories that the officials found objectionable. The Court concluded that the newspaper, which was produced by a high school journalism class, was "fairly ... characterized as part of the school curriculum" because it was "supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." Id. at 271, 108 S.Ct. 562. Because of its curricular nature, the newspaper did not qualify as a public forum. Id. at 272, 108 S.Ct. 562. The Court then held that, with respect to students' curricular speech, "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273, 108 S.Ct. 562. Both the majority and the dissent in Hazelwood agreed that "the First Amendment permits educators `to assure that participants learn whatever lessons the activity is designed to teach'" and that
 
 
 49
 the First Amendment should afford an educator the prerogative not to sponsor the publication of a newspaper article that is "ungrammatical, poorly written, inadequately researched, biased or prejudiced," or that falls short of the "high standards for ... student speech that is disseminated under [the school's] auspices...." ... The educator may ... constitutionally "censor" poor grammar, writing, or research because to reward such expression would "materially disrup[t]" the newspaper's curricular purpose.
 
 
 50
 Id. at 283-84, 108 S.Ct. 562 (Brennan, J., dissenting) (quoting id. at 271-72 & n. 4, 108 S.Ct. 562) (alteration in original); see also Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 91 n. 6, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (noting that a medical student properly may be judged on questions of personal hygiene and timeliness, as well as on questions of academic and clinical competence).
 
 
 51
 Settle v. Dickson County School Board, 53 F.3d 152 (6th Cir.1995), more strongly resembles the present case. There, the plaintiff argued that her ninth-grade teacher violated her First Amendment rights when she refused to approve the plaintiff's chosen topic for a class research paper and gave the plaintiff a grade of zero on the assignment when the plaintiff refused to comply with requirements related to the assignment. Id. at 155. The student had submitted only one topic for the teacher's approval, which the student duly received. Then the student — without the knowledge or approval of the teacher — changed her topic. Id. at 154. Relying on Hazelwood's recognition of a school's power to regulate classroom speech, the court rejected the plaintiff's First Amendment argument, holding:
 
 
 52
 The free speech rights of students in the classroom must be limited because effective education depends not only on controlling boisterous conduct, but also on maintaining the focus of the class on the assignment in question. So long as the teacher violates no positive law or school policy, the teacher has broad authority to base her grades for students on her view of the merits of the students' work. Grades are given as incentives for study, and they are the currency by which school work is measured.
 
 
 53
 ... So long as the teacher limits speech or grades speech in the classroom in the name of learning and not as a pretext for punishing the student for her race, gender, economic class, religion or political persuasion, the federal courts should not interfere.
 
 
 54
 Like judges, teachers should not punish or reward people on the basis of inadmissible factors — race, religion, gender, political ideology — but teachers, like judges, must daily decide which arguments are relevant, which computations are correct, which analogies are good or bad, and when it is time to stop writing or talking. Grades must be given by teachers in the classroom, just as cases are decided in the courtroom; and to this end teachers, like judges, must direct the content of speech. Teachers may frequently make mistakes in grading and otherwise, just as we do sometimes in deciding cases, but it is the essence of the teacher's responsibility in the classroom to draw lines and make distinctions — in a word to encourage speech germane to the topic at hand and discourage speech unlikely to shed light on the subject.
 
 
 55
 Id. at 155-56 (citations omitted). One judge concurred in the judgment, but concluded that the First Amendment was not implicated at all by the facts presented:
 
 
 56
 The bottom line is that when a teacher makes an assignment, even if she does it poorly, the student has no constitutional right to do something other than that assignment and receive credit for it. It is not necessary to try to cram this situation into the framework of constitutional precedent, because there is no constitutional question.
 
 
 57
 Id. at 158 (Batchelder, J., concurring in the judgment).
 
 
 58
 Hazelwood and Settle lead to the conclusion that an educator can, consistent with the First Amendment, require that a student comply with the terms of an academic assignment. Those cases also make clear that the First Amendment does not require an educator to change the assignment to suit the student's opinion or to approve the work of a student that, in his or her judgment, fails to meet a legitimate academic standard. Rather, as articulated by Hazelwood, "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." 484 U.S. at 273, 108 S.Ct. 562.
 
 
 59
 Plaintiff argues that the Hazelwood standard does not apply in the context of a university-level assignment, as distinct from a primary-school or secondary-school environment. It is true that the Court left open the question "whether the same degree of deference is appropriate with respect to school-sponsored expressive activities at the college and university level." Id. at 273 n. 7, 108 S.Ct. 562. It also is true that courts addressing the extent to which a public college or university, consistent with the First Amendment, can regulate student speech in the context of extracurricular activities, such as yearbooks and newspapers, have held that Hazelwood deference does not apply. See, e.g., Kincaid v. Gibson, 236 F.3d 342, 346 & nn. 4 & 5 (6th Cir.2001) (en banc) (holding that the Hazelwood standard did not apply in a challenge to Kentucky State University's regulation of the student yearbook); Student Gov't Ass'n v. Bd. of Trs. of Univ. of Mass., 868 F.2d 473, 480 n. 6 (1st Cir.1989) (concluding that Hazelwood "is not applicable to college newspapers"); see also Nicholson v. Bd. of Educ. Torrance Unified Sch. Dist., 682 F.2d 858, 863 n. 4 (9th Cir.1982) (in a case holding that a high school could require pre-publication review of newspaper articles without violating students' First Amendment rights, stating that "[d]ifferent considerations govern application of the first amendment on the college campus and at lower level educational institutions" and that "activities of high school students" may be reviewed more stringently than those of college students because "the former are in a much more adolescent and immature stage of life and less able to screen fact from propaganda" (citations and internal quotation marks omitted)).
 
 
 60
 However, the parties have not identified, nor have we found, any Supreme Court case discussing the appropriate standard for reviewing a university's regulation of students' curricular speech. It is thus an open question whether Hazelwood articulates the standard for reviewing a university's assessment of a student's academic work. We conclude that it does.
 
 
 61
 The Supreme Court has suggested that core curricular speech — that which is an integral part of the classroom-teaching function of an educational institution — differs from students' extracurricular speech and that a public educational institution retains discretion to prescribe its curriculum. For example, in Arkansas Educational Television Commission v. Forbes, 523 U.S. 666, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998), the Supreme Court held that a debate sponsored by a state-owned public television station was a nonpublic forum from which the broadcaster could exclude an independent candidate in the exercise of journalistic discretion. In reaching that conclusion, the Court said:
 
 
 62
 As a general rule, the nature of editorial discretion counsels against subjecting broadcasters to claims of viewpoint discrimination. Programming decisions would be particularly vulnerable to claims of this type because even principled exclusions rooted in sound journalistic judgment can often be characterized as viewpoint based.... Much like a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school prescribing its curriculum, a broadcaster by its nature will facilitate the expression of some viewpoints instead of others. Were the judiciary to require, and so to define and approve, pre-established criteria for access, it would risk implicating the courts in judgments that should be left to the exercise of journalistic discretion.
 
 
 63
 Id. at 673-74, 118 S.Ct. 1633 (emphasis added). The Court thus referred to the principle that a public school has discretion to engage in its own expressive activity of prescribing its curriculum.
 
 
 64
 An earlier Supreme Court case also distinguished between curricular and extracurricular activities in the First Amendment context. In Board of Education, Island Trees Union Free School District No. 26 v. Pico, 457 U.S. 853, 872, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), the Court held that a local school board could not remove books from the school library solely because the members of the board disliked the ideas contained therein. The plurality opinion of the Court was careful, however, to clarify that its ruling did not apply to curricular speech. The plaintiffs did not seek
 
 
 65
 to impose limitations upon their school Board's discretion to prescribe the curricula of the Island Trees schools. On the contrary, the only books at issue in this case are library books, books that by their nature are optional rather than required reading. Our adjudication of the present case thus does not intrude into the classroom, or into the compulsory courses taught there.
 
 
 66
 Id. at 862, 102 S.Ct. 2799; see also id. at 869, 102 S.Ct. 2799 (stating that the school board was attempting improperly "to extend [its] claim of absolute discretion beyond the compulsory environment of the classroom, into the school library and the regime of voluntary inquiry that there holds sway"); Horowitz, 435 U.S. at 90, 98 S.Ct. 948 (observing that "the decision of an individual professor as to the proper grade for a student in his course" is a determination that "requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial ... decisionmaking"); Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls, ___ U.S. ___, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (distinguishing between core educational functions and voluntary extracurricular activities for Fourth Amendment purposes and holding that a school district constitutionally may require all students to submit to drug testing as a prerequisite to participating in all competitive extracurricular activities).
 
 
 67
 In summary, under the Supreme Court's precedents, the curriculum of a public educational institution is one means by which the institution itself expresses its policy, a policy with which others do not have a constitutional right to interfere. Downs v. L.A. Unified Sch. Dist., 228 F.3d 1003, 1015-16 (9th Cir.2000), cert. denied, 532 U.S. 994, 121 S.Ct. 1653, 149 L.Ed.2d 636 (2001). The Supreme Court's jurisprudence does not hold that an institution's interest in mandating its curriculum and in limiting a student's speech to that which is germane to a particular academic assignment diminishes as students age. Indeed, arguably the need for academic discipline and editorial rigor increases as a student's learning progresses.
 
 
 68
 To the extent that the Supreme Court has addressed the difference between a university's regulation of curricular speech and a primary or secondary school's regulation of curricular speech, it has implied that a university's control may be broader. It has done so in its cases recognizing the doctrine of university professors' academic freedom, a doctrine that encompasses "the idea that universities and schools should have the freedom to make decisions about how and what to teach." Bd. of Regents of Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 237, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000) (Souter, J., concurring in the judgment). In Southworth, Justice Souter summarized the current state of "academic freedom" law:
 
 
 69
 In Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), we recognized these related conceptions: "Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself." Some of the opinions in our books emphasize broad conceptions of academic freedom that if accepted by the Court might seem to clothe the University with an immunity to any challenge to regulations made or obligations imposed in the discharge of its educational mission. So, in Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), Justice Frankfurter, concurring in the result ..., explained the importance of a university's ability to define its own mission by quoting from a statement on the open universities in South Africa:
 
 
 70
 "`It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail "the four essential freedoms" of a university — to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'"
 
 
 71
 ... While we have spoken in terms of a wide protection for the academic freedom and autonomy that bars legislatures (and courts) from imposing conditions on the spectrum of subjects taught and view-points expressed in college teaching..., we have never held that universities lie entirely beyond the reach of students' First Amendment rights.
 
 
 72
 Id. at 237-39, 120 S.Ct. 1346 (citations omitted).
 
 
 73
 We do not know with certainty that the Supreme Court would hold that Hazelwood controls the inquiry into whether a university's requirements for and evaluation of a student's curricular speech infringe that student's First Amendment rights. Nevertheless, of all the Supreme Court's cases, Hazelwood appears to be the most analogous to the present case.
 
 
 74
 In view of a university's strong interest in setting the content of its curriculum and teaching that content, Hazelwood provides a workable standard for evaluating a university student's First Amendment claim stemming from curricular speech. That standard balances a university's interest in academic freedom and a student's First Amendment rights. It does not immunize the university altogether from First Amendment challenges but, at the same time, appropriately defers to the university's expertise in defining academic standards and teaching students to meet them.
 
 
 75
 Applying the Hazelwood standard to the facts of this case, and viewing those facts in favor of Plaintiff, we conclude that Plaintiff cannot show a violation of his First Amendment rights. In this case, as in Settle, Plaintiff was given an assignment: the writing of a master's thesis. That assignment, like the paper in Hazelwood, is "fairly ... characterized as part of the ... curriculum," 484 U.S. at 271, 108 S.Ct. 562, because it was designed to teach Plaintiff how to research within an academic specialty and how to present his results to other scholars in his field. Therefore, like the newspaper in Hazelwood, Plaintiff's thesis was subject to a reviewing committee's reasonable regulation. Plaintiff was given reasonable standards for that assignment, including a pedagogically appropriate requirement that the thesis comply with professional standards governing his discipline. He was instructed that he should consult a standard style manual, or talk with members of his committee, about those requirements. Like the plaintiff in Settle, Plaintiff bypassed the approval process and prepared an assignment that did not comply with the stated criteria. Under Hazelwood and Settle, Plaintiff's committee members acted well within their discretion, and in conformity with the First Amendment, when they declined to approve the noncompliant section. Their decision was reasonably related to a legitimate pedagogical objective: teaching Plaintiff the proper format for a scientific paper.
 
 
 76
 Moreover, the committee members had an affirmative First Amendment right not to approve Plaintiff's thesis. See Parate v. Isibor, 868 F.2d 821, 828-30 (6th Cir.1989) (holding that a university professor has a First Amendment right to assign grades and evaluate students as determined by his or her independent professional judgment). That is especially true where, as here, the committee members' names appear in the thesis and where, according to the Guide, they are jointly responsible for its content. The presence of Defendants' affirmative right underscores Plaintiff's lack of a First Amendment right to have his nonconforming thesis approved.
 
 
 77
 Plaintiff counters, first, that the Guide does not require acknowledgments sections to meet academic and professional standards but, instead, grants students wide discretion to write whatever they want. According to Plaintiff, the use of the word "may" in the part of the Guide defining the "Dedication and/or Acknowledgments" section[3] of a thesis means that a student has complete discretion with respect to the content of that section — the student "may" dedicate the thesis to someone special or give thanks to helpful individuals in the section, or the student "may" use the section to communicate some other message. That is not a permissible reading of the Guide. An acknowledgments section has a well-defined form and purpose in academic writing. Moreover, the context is the statement in the Guide that the inclusion of such a section is "optional." Thus, the word "may" simply refers to the fact that a student "may" either include an appropriately drafted section thanking people or "may" omit the section altogether. That is, the discretion to which the term "may" refers is the discretion whether to include the section or not.[4]
 
 
 78
 Plaintiff also contends that the fact that the Guide permits the section to be in any "format" means that a student has freedom to choose the content of the acknowledgments section. We are not persuaded. "Format" commonly refers to the physical layout of a document, not its substantive content. See, e.g., The American Heritage Dictionary 535 (3d ed.2000). Nothing in the Guide suggests that "format" has a non-standard meaning here.
 
 
 79
 In the alternative, whatever the meaning of the Guide, Plaintiff argues that he has a First Amendment right to draft an acknowledgments section from any viewpoint. To the contrary, Hazelwood and Settle establish that — consistent with the First Amendment — a teacher may require a student to write a paper from a particular viewpoint, even if it is a view-point with which the student disagrees, so long as the requirement serves a legitimate pedagogical purpose. For example, a college history teacher may demand a paper defending Prohibition, and a law-school professor may assign students to write "opinions" showing how Justices Ginsburg and Scalia would analyze a particular Fourth Amendment question. In this case, the thesis committee was entitled to require that the acknowledgments section (if it were included) recognize those who made a positive contribution to Plaintiff's education. Such requirements are part of the teachers' curricular mission to encourage critical thinking (in the hypothetical examples) and to conform to professional norms (in this case).
 
 
 80
 Finally, Plaintiff argues, even if the Guide requires that an acknowledgments section meet academic and professional standards, there is a genuine issue of material fact as to whether UCSB enforced the standards in his case for nonpedagogical reasons. He argues that some other students were not required to conform to those standards, suggesting that there actually were no standards.
 
 
 81
 A few prior acknowledgments sections that arguably were "nonconforming" create no issue of material fact, for two reasons. First, and most importantly, this thesis committee was entitled to set an academic standard for Plaintiff's thesis, including its acknowledgments section, even if no thesis committee in the past ever had set one. Second, this thesis committee was entitled to adhere to written academic standards even if some other thesis committees (none of which was identical in composition to Plaintiff's committee) had been lax. The evidence on which Plaintiff relies is irrelevant; it simply has no bearing on whether his thesis committee had a legitimate pedagogical purpose. Instead, it simply shows, at best, that some professors are less rigorous in enforcing academic standards than others. While it would be preferable, as a matter of academic policy, for individual professors to strive for uniformity when evaluating students' work, inconsistency among individual professors in applying academic standards to students' work does not vest students with a constitutional right to passing grades on papers that would meet the approval of the easiest-grading professor. There is no First Amendment right to consistency.
 
 
 82
 Moreover, the summary judgment record does not support an inference that UCSB acted because of the content of Plaintiff's ideas, rather than the format and placement of those ideas. An academic thesis co-signed by a committee of professors is not a public forum, limited or otherwise.[5] As Defendants explained to him, Plaintiff remained free to publish and publicize his ideas in many other ways.
 
 
 83
 In short, the decision of Plaintiff's committee members not to approve the "Disacknowledgements" section did not violate Plaintiff's First Amendment rights. Because UCSB's decision not to place the thesis in the library and to defer granting Plaintiff's degree cannot be viewed as independent of the approval decision, those actions likewise did not violate Plaintiff's First Amendment rights. Therefore, the district court properly concluded that (a) Defendants are entitled to qualified immunity on Plaintiff's First Amendment claim and (b) Plaintiff cannot compel the library to file the unapproved thesis in the archives.
 
 
 84
 B. Qualified Immunity on the Procedural Due Process Claim
 
 
 85
 Plaintiff also argues that Defendants violated his clearly established right to due process when they "withheld [Plaintiff's] degree and otherwise harmed [him] without ever giving him a fair hearing."
 
 
 86
 Although Plaintiff labels Defendants' conduct punitive or disciplinary, the entire record belies that characterization. The undisputed facts show that Plaintiff was not punished on account of his "Disacknowledgements." To the contrary, Defendants at all times confirmed their approval of his thesis as it had been submitted to them, and even pointed helpfully to ways in which Plaintiff could express the criticisms embodied in the "Disacknowledgements." Defendants' only act was a simple refusal to approve the section because it did not meet academic and professional standards. As a result, Plaintiff did not receive his degree earlier because he had not met the requirements to receive it. In view of those facts, the decision not to approve Plaintiff's thesis is properly characterized as an "academic" decision, rather than as a "disciplinary" decision.
 
 
 87
 Board of Curators of University of Missouri v. Horowitz, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), establishes the standard for procedural due process in the context of academic decisions. In that case, the plaintiff argued that the university had violated her right to procedural due process when it dismissed her for academic reasons without first giving her a hearing. Id. at 79-80, 98 S.Ct. 948. The Court, without deciding whether the plaintiff had a protected liberty or property interest in continuing her education, rejected her argument. The Court held that, when dismissing a student for academic reasons, a university need not hold a hearing. Id. at 85, 89-91, 98 S.Ct. 948. A university meets the requirements of procedural due process so long as the dismissal decision is "careful and deliberate." Id. at 85, 98 S.Ct. 948.
 
 
 88
 Here, the initial decision not to confer Plaintiff's degree for academic reasons was analogous, although not identical, to the academic-dismissal decision in Horowitz. Applying analogous principles, procedural due process did not require Defendants to hold a formal hearing before they decided to defer conferral of Plaintiff's degree until he met academic requirements. Instead, it was sufficient for Defendants to make a "careful and deliberate" decision. The record — particularly the written decisions resolving Plaintiff's various appeals — shows that they did. Consequently, the facts, even when viewed in favor of Plaintiff, do not establish a violation of procedural due process. The district court properly held that Defendants were entitled to qualified immunity on Plaintiff's procedural due process claim.
 
 C. Plaintiff's State-Law Claim
 
 89
 The district court's decision granting summary judgment focuses entirely on Plaintiff's federal constitutional claims and is silent with respect to his claim under the California Constitution. The order does not state whether the court considered the state claim to be resolved or whether the court was dismissing the claim under United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (discussing when a federal court should retain pendent jurisdiction over state-law claims if federal claims are dismissed before trial). The reason for granting summary judgment was that Defendants were entitled to qualified immunity. Qualified immunity does not necessarily provide a ground for dismissing the California constitutional claim, even if the freedom of speech protected by the California Constitution is coextensive with the First Amendment. Consequently, we remand the case to the district court with directions either to address the state-law claim on the merits or to dismiss it.
 
 CONCLUSION
 
 90
 We hold that Plaintiff does not have a First Amendment right to have his nonconforming thesis approved, nor did he have a right to a formal hearing with respect to his committee's academic decision not to approve the thesis. As a result, Defendants are entitled to qualified immunity on Plaintiff's damages claims, and Plaintiff cannot compel Defendants to place the unapproved version of his thesis in the UCSB library.
 
 
 91
 Because the district court did not address Plaintiff's claim under the California Constitution, we remand the case to the district court to resolve it on the merits or dismiss it.
 
 
 92
 AFFIRMED with respect to the federal claims; REMANDED with respect to the California constitutional claim. The parties shall bear their own costs on appeal.
 
 
 
 Notes:
 
 
 [1]
 The standard for acknowledgments articulated by Turabian is consistent with the standards articulated by other style manualsSee, e.g., Scientific Style and Format 588 (Council of Biology eds., 6th ed. 1994) ("An acknowledgment section can carry notices of permission to cite unpublished work, identification of grants and other kinds of financial support, and credits for contributions to the reported work that did not justify authorship."); The New York Public Library Writer's Guide to Style and Usage 547 (Stonesong Press 1994) ("Acknowledgments. Here the author lists and thanks contributors, often including the editor, the designer, and any colleagues or experts who reviewed the manuscript.").
 
 
 [2]
 Contrary to the dissent's suggestion, UCSB's ultimate decision to award Plaintiff a master's degree despite his failure to meet all the required conditions for obtaining it (e.g., filing the thesis in the library) does not make those conditions nonmandatory and does not create a material issue of fact. Dissent at 966. Rather, this outcome suggests only that UCSB decided to violate its mandatory policy in the hope of avoiding litigation and bad publicity. There is no issue of fact as to the content of the policy and no evidence that UCSB ever has deviated from the policy before or since, except tobenefit Plaintiff in this one instance.
 
 
 [3]
 The section provides: "Youmay wish to dedicate this work to someone special to you or to acknowledge particular persons who helped you. Within the usual margin restrictions, any format is acceptable for these pages." (Emphasis added.)
 
 
 [4]
 As a corollary, Plaintiff suggests that there can be no legitimate pedagogical purpose served by imposing academic standards on a section that is optional. For students who choose not to include an acknowledgments section at all, he points out, no learning will take place. That may be true, but it does not follow that there is no legitimate pedagogical purpose served by imposing criteria on those who do include such a section. Footnotes, like this one, are optional, but in each academic discipline there is a proper way to use footnotes; university professors may demand conformity with that standard when a student includes footnotes
 
 
 [5]
 The dissent posits that a "public forum" analysis might provide an appropriate standard for this case. Dissent at 963-64. However, the dissent does not identify what, precisely, could constitute a public forum in this case
 
 
 
 93
 FERGUSON, Circuit Judge, concurring in the affirmance of the District Court and the remand on state issues:
 
 
 94
 I agree that the plaintiff's First Amendment rights were not violated and express a reasoning different from both of my associates.
 
 
 95
 This case is about an erosion of academic integrity. To put it in the vernacular, the guy cooked the books (his master's thesis), got caught, and now wants to shield his misbehavior under the umbrella of the First Amendment.
 
 
 96
 The plaintiff, in order to earn his master's degree, presented his thesis to his faculty committee for its approval. The thesis did not include the optional acknowledgment section. The committee approved the thesis as presented to them. The university requires that graduate students must file their approved thesis in the university library as an additional requirement for earning their master's degree.
 
 
 97
 Instead of submitting the approved copy of his thesis to the university library, the plaintiff, unknown to his thesis committee, added two pages of "Disacknowledgments," containing vulgar language naming the persons he believed to be the "degenerates" who posed "an ever-present burden during my graduate career...."
 
 
 98
 The librarian refused to file the altered thesis because it had not been approved by the faculty committee. University regulations provide that the faculty members who comprise the thesis committee are jointly responsible with the candidate for the content of the thesis. By adding the "Disacknowledgments" section to his thesis for submission to the university library, the plaintiff tried to circumvent the university's requirement of faculty approval and misrepresented to both the university and his academic field that his "Disacknowledgments" had been accepted by the faculty committee for publication.
 
 
 99
 The faculty committee was not required to approve the plaintiff's thesis with his post-approval modifications. The committee emphasized that its refusal to publish the thesis with the "Disacknowledgments" section was based on its conclusion that the plaintiff's addition of the material "after the examination, evaluation and signed approval of the original materials ... is unacceptable to the Committee." Thus, it was the academically dishonest manner in which the plaintiff tried to publish his "Disacknowledgments," rather than his views, that the committee disapproved.
 
 
 100
 The First Amendment does not protect nor authorize deception. Va. State Board of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake.") (citing Gertz v. Welch, Inc., 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). Just as the university could punish the plaintiff for plagiarism or cheating, so could it refuse to approve his dishonest addition of the "Disacknowledgments." See Slaughter v. Brigham Young Univ., 514 F.2d 622, 624 (5th Cir.1975) (finding no First Amendment problem with a student code of conduct that authorized expulsion of a graduate student for using his professor's name, without his knowledge, as a coauthor in an article he submitted for publication). The plaintiff cannot cheat and then seek to evade accountability through the First Amendment.
 
 
 101
 Accordingly, the plaintiff's First Amendment claim fails.
 
 
 102
 REINHARDT, Circuit Judge, concurring in part and dissenting in part:
 
 
 103
 Although the underlying dispute may appear to some to be trivial, and perhaps not worthy of serious First Amendment deliberation, the extreme positions taken by the parties during the course of their disagreement and the erroneous legal rule advocated by one of my colleagues leaves me with little choice but to discuss the constitutional questions in some depth. I agree that we should affirm the district court's grant of summary judgment with respect to Brown's procedural due process claim and that we should remand the state law claims for further consideration. I respectfully dissent, however, from my colleagues' decision to affirm the award of summary judgment to the university with respect to Brown's First Amendment claims.
 
 
 104
 First, I emphasize that there is no agreement between my colleagues in the majority as to the legal standard applicable to Brown's First Amendment claims. Thus, there is no majority opinion and no binding precedent with respect to any First Amendment principles. Although Judges Graber and Ferguson reach the same conclusion, they do so for wholly different reasons. Judge Graber would apply the First Amendment standard that the Supreme Court created for high school student speech in Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), to the speech of college and graduate students and would affirm the district court's grant of summary judgment to the university defendants on the ground that under that standard it may regulate the content of the "Disacknowledgments" that Brown inserted in his thesis. Judge Ferguson would also affirm the district court's decision, but would do so because he believes that this case is about punishing a student who was caught "cheating," an action that he does not believe triggers First Amendment review. He believes that it is the insertion of unauthorized material in Brown's thesis — an act of cheating or deception — that caused the university to discipline him. Because he does not believe that the First Amendment protects cheating — and on that legal question I agree with him — Judge Ferguson does not address the First Amendment standard that is applicable to the regulation of college and graduate student speech.
 
 
 105
 I disagree with both of my colleagues' positions. I disagree with Judge Graber because she would have this court adopt an erroneous First Amendment standard for a university's attempts to regulate the speech of college and graduate students, and also because, even if that standard were applicable, the issues regarding the University's excessive response to Brown's disacknowledgments are not appropriate for decision without a trial on the facts. I disagree with Judge Ferguson because the record does not in any way support his conclusion as to the reason Brown was disciplined. Moreover, at the very least, the university's motivation for disciplining Brown is a question of fact that cannot be resolved on summary judgment.
 
 
 106
 Judge Graber would have us adopt a First Amendment standard regarding the authority of public universities to limit the speech of graduate students that I believe to be wholly inappropriate — a standard that would seriously undermine the rights of all college and graduate students attending state institutions of higher learning. Specifically, she would import into the college and graduate academic world the limitations on speech that the Supreme Court has held appropriate for use in the case of emotionally less mature high school students. Because the reasons underlying the deference with respect to the regulation of the speech rights of high school youths do not apply in the adult world of college and graduate students, an arena in which academic freedom and vigorous debate are supposed to flourish, I cannot agree with Judge Graber's conclusion that the First Amendment standard established in Hazelwood applies at the university level.
 
 
 107
 Even were the Hazelwood standard applicable to this case, I would vigorously disagree that a university's decision to withhold a graduate student's degree for almost a year, despite the fact that he has successfully completed his masters thesis and complied with all of the department's other academic requirements, is a "reasonable" response to his attachment to his chemistry thesis of a one and a half page prefatory disacknowledgments section in which he caustically expresses his view that university and other public officials obstructed rather than aided his progress toward a graduate degree. Nor, in my opinion, is it a reasonable response to such expressive conduct for the university to exacerbate its retaliatory action by placing the offending graduate student on academic probation for the period during which his degree is being withheld, thus making him ineligible for a teaching or research position or for financial support.
 
 
 108
 The university's extreme actions in response to Brown's speech — speech that was highly critical of university and other public officials — raises a genuine question of material fact as to whether the university punished him because of the viewpoint he sought to express or whether, as the Judge Graber appears to believe, it simply desired to further a legitimate pedagogical concern. Thus, a genuine issue of fact as to the university's extreme actions exists even if, as I willingly assume for purposes of this dissent, the university had the right to refuse to file Brown's thesis in the library archives as long as he insisted that it not be filed without the hostile disacknowledgments. Summary judgment was therefore wholly inappropriate.
 
 
 109
 Of equal importance, Judge Graber's rejection of Brown's principal constitutional claims is based entirely on a false premise. She begins her opinion by assuming, contrary to fact, that the university's refusal to approve of Brown's disacknowledgments statement and to file his thesis with the disacknowledgments in the library archives required it to withhold his degree for almost a year and to deprive him of university financial assistance by placing him on academic probation.[1] On the basis of that incorrect assumption, she concludes that we need not discuss Brown's claims that the withholding of his degree and the imposition of financial sanctions constituted punishment for the expression of his views. Specifically, she contends that Brown cannot state separate First Amendment claims for the university's decisions to withhold his degree and to place him on academic probation because those decisions were nondiscretionary and were compelled by the university's earlier decision not to approve his thesis with the disacknowledgments statement included. However, that contention is plainly incorrect. The fact that the university had no quarrel with the academic content of Brown's thesis and that it did indeed confer his degree on him after withholding it for almost a year, even though he continued to refuse to submit a revised thesis without the disacknowledgments statement, demonstrates beyond any question that the university did have the discretion to confer the degree and totally belies Judge Graber's ipse dixit assertion to the contrary.[2] Thus, without any basis in fact or law, Judge Graber simply refuses to confront, or even discuss, the principal constitutional issues presented in this case — whether the university's allegedly retaliatory and punitive actions denying Brown the right to graduate and to receive financial assistance during his involuntary extended tenure as a graduate student violated his First Amendment rights.
 
 
 110
 Judge Ferguson similarly avoids the principal constitutional issues in this case by simply stating that Brown was punished, not on the basis of his views, but rather because of "the academically dishonest manner in which [he] tried to publish his `Disacknowledgments.'" This assumption, however, is also not supported by the factual record. The university was not interested in punishing Brown for "cheating." It was perfectly willing not to discipline him at all for his "deception." In fact, it was willing at all times to file the thesis in the library archives and give Brown his degree, without imposing any discipline whatsoever, if he would simply remove the disacknowledgments statement or allow the librarian to do so. It later awarded him the degree despite his refusal to remove the statement, not because he had received adequate punishment, but because it changed its mind about continuing to wage the battle at that escalated level. In fact, it appears to me that the university was not nearly as affronted as Judge Ferguson by Brown's act of inserting an unauthorized disacknowledgments statement as a preface to his thesis. It simply did not want to place the thesis in the library as long as it included the disacknowledgments. At the very least, there is a genuine issue of fact as to whether the university was motivated by a desire to punish Brown for making post-approval modifications to the thesis or by its disagreement with the views that he expressed in the disacknowledgments.
 
 
 111
 It may be helpful to re-state at this point the history of this dispute. The question we must decide is whether Brown has raised a genuine issue of material fact as to whether the university punished him for the views he sought to express. There can be no question that the substantive portion of Brown's thesis — his work on the morphology of calcium carbonate — was approved by his thesis committee and that, had nothing further occurred, he would have graduated shortly thereafter. Following the approval of the thesis, however, Brown inserted as a forward a disacknowledgments statement. It was in response to this one and a half page insert that the university decided to withhold Brown's degree for almost a year (until sufficiently pressured to do otherwise) and to deprive him of financial support during that period by placing him on academic probation. Judge Graber ignores the questions raised by the drastic sanctions that the university imposed on Brown's speech. In both the introduction and conclusion sections of her opinion, she characterizes this case as one involving only a thesis committee's decision "not to approve" of or "assign a passing grade to" Brown's thesis.[3] She applies the First Amendment standard she would have us adopt to that action only and fails to discuss entirely how the excessive punishment could be justified in light of the Free Speech Clause. Brown's complaint, as well as the record on summary judgment, clearly demonstrates, however, that this case is about much more than the mere decision not to approve the disacknowledgments or the ensuing decision not to permit the placement of the thesis in the library.[4]
 
 
 112
 In the first paragraph of his complaint, Brown states that he is suing for "declaratory relief and ... damages" because "his degree was withheld from him" in violation of the First Amendment. Moreover, Brown's first claim for relief in the complaint, asserts that "[d]efendants' decision to withhold plaintiff's Master's Degree because of his critical comments ... was an unconstitutional infringement" on his First Amendment rights (emphasis added).
 
 
 113
 The university's decision to withhold Brown's degree for almost a year after he had completed all of the academic requirements to earn a degree appears to be clearly unreasonable. More important, for purposes of this appeal, the university's drastic actions raise a genuine issue of material fact as to whether the sanctions it imposed on Brown were motivated by a desire to punish him because of the views he sought to express or were simply designed to further its legitimate pedagogical concerns in some manner. Such questions are ordinarily not appropriate for decision on summary judgment, see, e.g., Hunt v. Cromartie, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) ("[I]t was error in this case for the District Court to resolve the disputed fact of motivation at the summary judgment stage."), and this case is no exception. Accordingly, I would permit Brown to present his First Amendment arguments to a jury, as the Constitution requires.
 
 
 114
 I. Hazelwood's standard does not apply to college and graduate school student speech.
 
 
 115
 I vehemently disagree with Judge Graber's conclusion that Hazelwood provides the appropriate First Amendment standard for college and graduate student speech and begin this section by emphasizing that her opinion on this point is hers alone and is not joined by any other judge on this panel. Thus, her desire to import the Hazelwood standard into the university context does not constitute binding precedent. Rather, the appropriate speech standard for college and graduate students speech remains an open question in this circuit. It is precisely because the question remains an open one here and elsewhere that I address Judge Graber's analysis in some depth and explain why Hazelwood's deferential standard is inappropriate for college and graduate student speech.
 
 
 116
 In Hazelwood, the Court addressed the degree of First Amendment protection available to high school student speech and held that high school educators "do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273, 108 S.Ct. 562; see also Settle v. Dickson County Sch. Bd., 53 F.3d 152 (6th Cir.1995) (applying the Hazelwood standard to the speech of a junior high school student writing a research paper). In so holding, the Hazelwood Court emphasized that a First Amendment standard that is more deferential to school officials is appropriate in a high school setting because high school students are young, emotionally immature, and more likely to be inappropriately influenced by school-sponsored speech on controversial topics. Hazelwood, 484 U.S. at 272, 108 S.Ct. 562 ("[A] school must be able to take into account the emotional maturity of the intended audience...."); see also Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 683-84, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (emphasizing that one reason why high school officials should be accorded more deference to limit student speech is because a high school audience is "less mature"); Planned Parenthood of Southern Nevada, Inc. v. Clark Cty. Sch. Dist., 941 F.2d 817, 829 (9th Cir.1991) (en banc) (discussing the immaturity of a high school audience and stating that the First Amendment standard applicable to high school student speech must provide educators with "the ability to consider the emotional maturity of the intended audience").
 
 
 117
 The Supreme Court has recognized that college and graduate students, unlike high school students, are more mature, independent thinkers who are less likely to be influenced by the school-sponsored publication of controversial ideas. See, e.g., Widmar v. Vincent, 454 U.S. 263, 274 n. 14, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) ("University students are, of course, young adults. They are less impressionable than younger students."); Tilton v. Richardson, 403 U.S. 672, 688, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (recognizing that "college students are less impressionable"). In fact, discussion of controversial ideas on a college campus is essential to the "background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition" in the university setting. Rosenberger v. Rector and Visitors of the Univ. of Virginia, 515 U.S. 819, 835, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Vigorous debate on controversial topics is consistent with the Supreme Court's description of our college and university campuses as "vital centers for the Nation's intellectual life." Id. at 836, 115 S.Ct. 2510; see also Widmar, 454 U.S. at 268 n. 5, 102 S.Ct. 269 ("The college classroom with its surrounding environs is peculiarly the marketplace of ideas." (internal quotations omitted)).
 
 
 118
 Because college and graduate school students are typically more mature and independent, they have been afforded greater First Amendment rights than their high school counterparts, just as they have been afforded greater legal rights in general. Along with the right to vote, most college and graduate school students are permitted to drive automobiles, to purchase cigarettes, to marry, and even to join the military; many high school students do not enjoy any of these rights or privileges. Similarly, most college students and almost all graduate students may legally consume alcohol, a right not generally available to high school students. Although we have not explicitly addressed how much protection to give the First Amendment rights of college and graduate school students, we have recognized that
 
 
 119
 [d]ifferent considerations govern application of the first amendment on the college campus and at lower level educational institutions. The activities of high school students, for example, may be more stringently reviewed than the conduct of college students, as the former are in a much more adolescent and immature stage of life.
 
 
 120
 Nicholson v. Board of Educ. Torrance Unified Sch. Dist., 682 F.2d 858, 863 n. 4 (9th Cir.1982) (internal quotations omitted); see also Mabey v. Reagan, 537 F.2d 1036, 1046-47 (9th Cir.1976) ("A college relies in large measure on faculty self-governance and its contributions to administrative decisions. This is analogous to, but different from a high school's need to `discipline by ... superiors.'"). In Hazelwood itself, the Supreme Court recognized that "the same degree of deference" shown to high school officials may not be "appropriate" when analyzing the First Amendment protection available to "school-sponsored expressive activities at the college and university level." Id. at 273 n. 7, 108 S.Ct. 562. When discussing the First Amendment rights of college students generally, the Supreme Court noted that "the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); see also Board of Regents of the Univ. of Wisconsin Sys. v. Southworth, 529 U.S. 217, 239 n. 4, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000) (emphasizing that "the right of teaching institutions to limit expressive freedom of students ha[s] been confined to high schools ..., whose students and their schools' relation to them are different and at least arguably distinguishable from their counterparts in college education.").
 
 
 121
 Judge Graber's suggestion that we import the Hazelwood standard into the college and university context is particularly unfortunate, because the standard is a deferential one that courts often use to justify highly questionable actions by high school educators that restrict controversial speech. See, e.g., Planned Parenthood, 941 F.2d at 829 (holding that the school district's justification for refusing to publish family planning advertisements was reasonable under the Hazelwood standard); Fleming v. Jefferson County Sch. Dist., 298 F.3d 918 (10th Cir.2002) (upholding a school district's guidelines restricting a tile painting project at area high schools under the Hazelwood standard); McCann v. Fort Zumwalt Sch. Dist., 50 F.Supp.2d 918 (E.D.Mo.1999) (holding that school board's decision to prohibit the high school marching band from performing a song that it interpreted as promoting the illegal use of drugs was reasonable under Hazelwood).
 
 
 122
 Recognizing that college and graduate student speech should be entitled to greater First Amendment protection than that of high school students, the Sixth Circuit has explicitly declined to apply Hazelwood's deferential First Amendment standard in the university setting. See Kincaid v. Gibson, 236 F.3d 342, 354 (6th Cir.2001) (en banc). In Kincaid, a public university attempted to suppress the speech of some of its college students by withholding publication of the school yearbook. Kincaid, 236 F.3d at 345-46. The Sixth Circuit, on rehearing en banc, held that the Hazelwood standard was inapplicable and instead concluded that the yearbook was a limited public forum in which viewpoint discrimination was impermissible and content-based regulations were permissible only when narrowly drawn to effectuate a compelling state interest. Id. at 354; see also Student Govt. Ass'n v. Board of Trustees of the Univ. of Mass., 868 F.2d 473, 480 n. 6 (1st Cir.1989) (stating that the Hazelwood standard does not apply to a college newspaper).
 
 
 123
 Judge Graber attempts to distinguish the First and Sixth Circuit decisions from the instant case by characterizing the student speech in college yearbooks and newspapers as extracurricular speech that is entitled to broader First Amendment protection than the curricular speech at issue here. Her suggested distinction between curricular and extracurricular speech, however, is belied by the Supreme Court's analysis in Hazelwood itself. Hazelwood involved a challenge to the school's censorship of a high school newspaper. The Court specifically stated that "school-sponsored publications [and] theatrical productions" that are "supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences" are examples of expressive activities that "bear the imprimatur of the school" and are therefore subject to the same degree of First Amendment scrutiny as curricular speech, even if they do not "occur in a traditional classroom setting." Hazelwood, 484 U.S. at 271, 108 S.Ct. 562; see also Planned Parenthood, 941 F.2d at 827 (interpreting the Supreme Court's Hazelwood decision and holding that "the Court intended that the same principles that animate educational decisions ... come into play when determining what advertisements are suitable for publication in school newspapers, yearbooks and athletic programs" (emphasis added)). The yearbook at issue in Kincaid was under the management of a "Student Publications Board" consisting of "faculty[] and university officials," as well as students. Kincaid, 236 F.3d at 349. Thus, student speech in the yearbook was just as likely to be perceived by members of the public "to bear the imprimatur of the school" as student speech in a curricular context. Hazelwood, 484 U.S. at 271, 108 S.Ct. 562. Despite the evident similarity in subject matter in Hazelwood and Kincaid, the Sixth Circuit refused to apply the Hazelwood high school standard to a university's decision to withhold publication of a yearbook and instead applied a standard that was more protective of university students' First Amendment rights. When discussing its rationale, the Kincaid court emphasized the fact that university students are "less impressionable than younger students" and noted that "[t]he danger of chilling ... individual thought and expression ... is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." Kincaid, 236 F.3d at 352 (quoting Widmar, 454 U.S. at 274 n. 14, 102 S.Ct. 269, and Rosenberger, 515 U.S. at 835-36, 115 S.Ct. 2510). Thus, Judge Graber's purported curricular/extra-curricular distinction provides no basis for distinguishing Kincaid and Student Government Association and is disingenuous at best.
 
 
 124
 Because I believe that the First and Sixth Circuits appropriately afforded college and graduate student speech, whether curricular or extracurricular, greater First Amendment protection than high school student speech, and because the importation of the Hazelwood standard into the college and graduate school context would dilute the free speech rights of all students attending public institutions of higher learning, I respectfully disagree with Judge Graber's conclusion that Hazelwood's reasonableness standard should apply to Brown's First Amendment claims.
 
 
 125
 II. There are a number of more speech-protective standards that could be applied to college and graduate student speech.
 
 
 126
 Although our three-way set of opinions leaves open the question of what First Amendment standard applies to the regulation of college and graduate student speech, it is worth considering what that standard might be. There are a number of possible standards that are more protective of student speech than the Hazelwood standard, and yet still respect a university's need to further its legitimate pedagogical purposes. I will mention only two.
 
 
 127
 First, there is the limited or designated public forum in which the government opens a forum "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). In a limited public forum, the government may impose reasonable time, place, and manner restrictions on speech; viewpoint-based restrictions are impermissible; and all content-based restrictions must be narrowly drawn to effectuate a compelling state interest. Id. This is the standard that the Sixth Circuit applied in Kincaid when it held that the university's yearbook constituted a limited or designated public forum in which content-based regulations were subject to strict scrutiny review. Kincaid, 236 F.3d at 347, 354.[5]
 
 
 128
 Another possibility is to adopt an intermediate level of scrutiny for regulations of student speech in college and graduate programs. Cf. United States v. Virginia ("VMI"), 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (applying intermediate scrutiny to gender-based classifications in equal protection jurisprudence). Under an intermediate level of scrutiny, the university would have the burden of demonstrating that its regulation of college and graduate student speech was substantially related to an important pedagogical purpose. Id. at 533, 116 S.Ct. 2264. Although intermediate scrutiny is more protective of First Amendment speech rights than the Hazelwood standard, it affords more deference to educators' content-based decisions than does the strict scrutiny standard that applies under a limited public forum analysis.
 
 
 129
 When determining what standard is appropriate for analyzing regulations of college and graduate student speech, it is important to distinguish student speech from university speech, teacher or other employee speech, and the speech of private individuals using the university's facilities. Cf. Rosenberger, 515 U.S. at 833-34, 115 S.Ct. 2510 (distinguishing between a university's right to determine the content of the education that it provides, which is the university's speech, and the university's ability to regulate the speech of private individuals who use its facilities). It may be that different First Amendment standards are applicable in different contexts to restrictions imposed at the university level depending on both the speaker and the nature of the particular forum. For purposes of this dissent, I need not decide what standard(s) of review is appropriate for analyzing a university's attempts to regulate college or graduate student speech in general, or Brown's in particular, because, regardless of what standard is deemed applicable, Brown has established a genuine issue of material fact as to the university's motivation for imposing such extreme sanctions in response to his attempt to add a disacknowledgments section to an already-approved thesis. The constitutional questions in this case cannot be resolved on summary judgment, regardless of the standard employed.[6]
 
 
 130
 III. Even if Hazelwood were the applicable standard, the University's decisions to place Brown on academic probation and to withhold his degree for almost a year would raise genuine issues of material fact that preclude summary judgment.
 
 
 131
 Even under Hazelwood's highly deferential standard, questions of material fact remain that preclude summary judgment. When applying the Hazelwood standard, we first balance the totality of the school's actions — particularly its decisions to withhold Brown's degree for almost a full year and to place him on academic probation for that period, thus making him ineligible for a university teaching or research position or for financial support — against the university's purported pedagogical concern — its interest in ensuring that graduate students write theses that not only meet all of its academic standards but also conform to the "proper format" for a scientific paper — in order to determine whether the university's actions were "reasonably related to legitimate pedagogical concerns." Hazelwood, 484 U.S. at 273, 108 S.Ct. 562. Here, the university's imposition of so extreme a sanction appears grossly disproportionate when balanced against the minor nature of Brown's alleged transgression and against its own interest in ensuring that all of its rules and regulations are fully complied with and that all of its students learn how to follow the proper format for scientific and other academic papers. The unusual severity of the actions taken by the university is sufficient in itself to raise a genuine issue of material fact as to whether its decisions to withhold Brown's degree for almost a year and to place him on academic probation during that time are "reasonably related" to a legitimate pedagogical purpose.
 
 
 132
 The record clearly does not permit us to determine at the summary judgment stage of the proceedings the university's motivations in imposing so extreme a sanction on Brown. In this circuit, Hazelwood, like all the other standards I have discussed, prohibits school officials from discriminating against student speech on the basis of viewpoint. See Planned Parenthood, 941 F.2d at 829-30 (holding that Hazelwood requires, consistent with First Amendment jurisprudence in other contexts, that all restrictions on student speech be viewpoint neutral); see also Downs v. Los Angeles Unified Sch. Dist., 228 F.3d 1003, 1010-11 (9th Cir.2000) (stating that restrictions on school-sponsored speech in a nonpublic forum must be viewpoint neutral); Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510 ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."). Here, the university's draconian actions in response to Brown's unsuccessful attempt to publish his disacknowledgments raise a question of material fact about whether the university was motivated, not by its asserted pedagogical purposes, but by a desire to punish Brown for the viewpoint that he sought to express by having his disacknowledgments included in the thesis.[7]
 
 
 133
 As I have noted, I do not question the university's rejection of the disacknowledgments as a part of the thesis, only the imposition of the punitive actions. It is significant, however, that in the disacknowledgments, Brown accused the Dean, the staff of the graduate division, the management of the university library, a former University professor, the former Governor, and the UC Regents of placing obstacles in his path toward obtaining a degree and castigated them for "being an ever present hindrance during [his] graduate career." Brown's views are certainly ones that Dean Li and the professors on Brown's thesis committee would find highly offensive. The extreme severity of the university's reactions — its decision to withhold Brown's degree for almost a year and to place him on academic probation, thus making him ineligible for a university teaching or research position and for financial support — is sufficient, standing alone, not only to raise a question of gross disproportionality but to raise a question of fact as to whether it was Brown's insistence on publishing the hostile views expressed in the disacknowledgments and not his mere non-compliance with the "proper format for a scientific paper" that motivated the University to impose such harsh sanctions.
 
 
 134
 The timing of the university's decision to award Brown his degree after almost a year also raises a question about its motivation for withholding the degree in the first instance. On May 11, 2000, a producer for "ABC's Nightly News with Peter Jennings" contacted Brown expressing interest in learning more about his struggle with the administration over his disacknowledgments section. University officials spoke with the producer on May 14, 2000 and Brown was interviewed on May 15, 2000. The very next day, Brown received a letter via Federal Express stating that the university had decided to award him a degree. The university contends that the timing was coincidence, that the Dean had requested a departmental recommendation on Brown's status a month before the interviews were conducted, and that the interview with university officials actually took place after they had decided to award Brown a degree. The university officials, however, admit that they were contacted by the producer during the last week of April or the first week of May, which, viewing the facts in the light most favorable to the non-moving party, is approximately three weeks before Brown received the federal express package stating that he was going to receive his degree. Ultimately, there is a question of fact about what motivated the university's decision to award Brown his degree and what, if anything, that reveals about its reasons for withholding the degree in the first instance. Certainly it raises a genuine issue of fact (to put it mildly) regarding Judge Graber's assertion that the university was compelled to withhold Brown's degree because he failed to submit a thesis in the required form.
 
 
 135
 One need only examine some of the acknowledgments that the university has accepted in the past to see that something more than the non-compliant format of Brown's disacknowledgments may have motivated the university's decision to withhold his degree and place him on academic probation. Other acknowledgments with equally offensive language were approved by the university with no adverse consequences for the author. For example, Dr. Mark Sanson Morey's dissertation acknowledgment, which was approved by his thesis committee, contained the following statements:
 
 
 136
 To: 1) the dips**ts who decided to put the P-chemists on the forth [sic] floor, 2) the inept facilities management monkey who raised the cooling water pressure and 3) the dumb ass who left his cooling water ON for a laser that was OFF for 2 years and subsequently flooded my lab, desk, and my most important files: may your bloated, limb-less bodies wash to shore and be picked clean by seabirds and maggots....
 
 
 137
 While it is true, as Judge Graber states, that different thesis committees are likely to apply the university's standards differently, the existence of other "non-conforming" acknowledgments that were approved without any adverse consequences for the author is relevant to the question of the university's reason for imposing such drastic sanctions on Brown. If non-compliance with the proper format for a scientific paper were the actual reason for the university's actions, dissertation acknowledgments like Dr. Morey's would also have been prohibited. Drawing all inferences in Brown's favor as we must when reviewing the district court's grant of summary judgment to the university defendants, there is a genuine issue of material fact about whether the university's purported reason for depriving Brown of financial support and the opportunity to graduate because of his insistence on including the disacknowledgments was pretextual, and whether the actual reason the university refused to allow him to receive financial benefits and permit him to graduate was that the administration sought to punish him for the viewpoint he tried to express when he insisted that his thesis include a prefatory one and a half page disacknowledgments statement castigating university and other public officials.
 
 
 138
 In sum, Brown has raised genuine issues of material fact as to whether the university defendants violated his First Amendment rights, even under the most deferential First Amendment standard available — a standard that was clearly established at the time of the events in this case. Moreover, a reasonable school official would have known that, even under Hazelwood's "reasonableness" standard, placing a graduate student on academic probation and withholding his degree for almost a year solely because he attempted to include a one and a half page statement highly critical of university and other public officials in his thesis would be unreasonable and would violate the student's First Amendment rights. Accordingly, I respectfully dissent from my colleagues' conclusions (implicit or explicit) on Brown's principal First Amendment claims. I would reverse the district court's grant of summary judgment in favor of the defendants in part, and remand in order to allow Brown to pursue those claims and to seek damages in connection with the principal First Amendment violations he alleges.
 
 
 
 Notes:
 
 
 [1]
 In footnote 2 of her opinion, Judge Graber contends that the university was following its "mandatory policy" when it withheld Brown's degree. The "policy" to which she refers, however, simply does not exist. There is no policy in the record that requires that, in order to obtain a degree, a student, in addition to completing all of the academic requirements for a master's degree, must file his thesis in the university's library archives. With respect to the policy that is in the record, there is at best a genuine issue of fact as to whether the meaning Judge Graber's opinion ascribes to its vague terms is plausible. Moreover, there is nothing in the record suggesting that the university hasever refused to award a master's degree to a graduate student who has complied with all of the academic requirements simply because the student wanted to add an acknowledgments or disacknowledgments statement to his thesis. If anything violates the university's policy and does so for the first time, it is not, as Judge Graber's opinion states, the university's belated decision to grant a student the degree he had earned; rather, it is the withholding of a degree for almost a year from a graduate student who had completed all of the academic requirements for his degree, including the completion of a master's thesis, merely because he wanted to include a prefatory disacknowledgments statement.
 
 
 [2]
 Moreover, the fact that Brown was notified of the university's decision to award him a degree two days after a producer from "ABC's Nightly News with Peter Jennings" interviewed university officials about Brown's disacknowledgments and three weeks after ABC first contacted the university about Brown's complaints raises a substantial question about the university's motivation for withholding the degree for the preceding year
 
 
 [3]
 She argues that the university did not approve the thesis because, so long as the disacknowledgments were included, it was not in a proper academic format. She also says that it is an appropriate pedagogical function to teach graduate chemistry students how to write optional acknowledgments, and, apparently, that if they have not learned that skill, they are not qualified to receive advanced degrees in chemistry
 
 
 [4]
 Judge Ferguson also discusses only the university's refusal to publish the thesis. However, having resolved the factual dispute over the university's reason for disciplining Brown in favor of the university, on the basis of dishonesty, a theory not even argued by that body, it would appear that the First Amendment would not affect his judgment as to the excessive punishment question
 
 
 [5]
 The Foundation for Individual Rights in Education, Inc., participating in this case asamicus curiae, contends that limited public forum analysis should apply to the university's actions in this case.
 
 
 [6]
 I reiterate that I assume throughout this opinion that the university had a right not to approve the prefatory disacknowledgments statement and to refuse to place the thesis in its library so long as Brown insisted on attaching that statement to the thesis. My colleagues may well be correct that the university's actions in that respect do not offend the First Amendment under any appropriate standard, even though they disagree on the reasons for reaching that conclusion. That, however, disposes of only one issue, a comparatively minor one as far as I am concerned, and does not resolve Brown's principal constitutional claims
 
 
 [7]
 Judge Ferguson resolves the disputed issue of fact by declaring that the university's actions were motivated by a desire to punish Brown for sneakily and dishonestly inserting unauthorized material into his thesis after it had already been approved. The record, as I read it, does not support this conclusion. The university's offer to afford Brown all of the same benefits that he would have received before he "cheated" if he would simply remove the offending material from his thesis belies the argument that the sanctions were imposed to punish him for cheating. It seems to me far more likely that the sanctions were imposed because he insisted on attempting to publicize his unpopular views. At the very least, however, there is a question of fact about the university's motivation — a question that is not appropriately resolved on summary judgment