**Monica POMPEO, Plaintiff–Appellant,**

v.

**BOARD OF REGENTS OF THE UNIVERSITY OF NEW MEXICO; Caroline Hinkley; Susan Dever, in their individual capacities, Defendants–Appellees.**

No. 15-2179

United States Court of Appeals, Tenth Circuit.

March 28, 2017

**(D.C. No. 1:13-CV-00833-MCA-CG)**

Robert J. Gorence, Gorence & Oliveros, P.C., Albuquerque, New Mexico; (Louren Oliveros and Christina Cavaleri, Gorence

& Oliveros, P.C., Albuquerque, New Mexico, with him on the briefs); for Plaintiff-Appellant.

Sean Olivas, Keleher & McLeod, Albuquerque, New Mexico; (Thomas C. Bird and Zachary R. Cormier, Keleher & McLeod, P.A., Albuquerque, New Mexico, with him on the brief), for Defendants-Appellees.

Before LUCERO and EBEL, Circuit Judges.[*]

LUCERO, Circuit Judge.

This appeal requires us to enter the intersection of deference to educators in the academic setting and the exercise of freedom of speech under the First Amendment. Because educators should strive to establish relationships of mutual trust and respect with their students, encouraging them to "remain free to inquire, to study and to evaluate, to gain new maturity and understanding," Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (plurality opinion), we abhor actions that "cast a pall of orthodoxy over the classroom," Keyishian v. Bd. of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). Nevertheless, our jurisprudence has long recognized that the "freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior." Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 681, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). Federal courts "do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not

directly and sharply implicate basic constitutional values." Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).

Monica Pompeo, a student in a graduate-level course at the University of New Mexico ("UNM"), asks us to intercede in precisely such a dispute. She claims that UNM officials retaliated against her in violation of her free speech rights because they disagreed with viewpoints she expressed in an assigned class paper. We held in Axson-Flynn v. Johnson, 356 F.3d 1277 (10th Cir. 2004), that courts may not override an educator's decision in the school-sponsored speech context "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment" and instead used "the proffered goal or methodology [as] a sham pretext for an impermissible ulterior motive." Id. at 1293 (quotation omitted). In that case, we held that a compelled speech requirement may have been imposed as "a pretext for religious discrimination." Id. We are asked by Pompeo to draw an analogy between the religious discrimination at issue in Axson-Flynn and the viewpoint discrimination she brings to us. Yet our court has specifically held that precedent "allows educators to make viewpoint-based decisions about school-sponsored speech" and may restrict speech they believe contains "inflammatory and divisive statements." Fleming v. Jefferson Cty. Sch. Dist. R-1, 298 F.3d 918, 926, 934 (10th Cir. 2002). Exercising jurisdiction under 28 U.S.C. § 1291, for the reasons we elaborate herein, we affirm.

---

[*] The Honorable Neil Gorsuch considered this appeal originally but did not participate in this Opinion. The practice of this court permits the remaining two panel judges, if in agreement, to act as a quorum in resolving the appeal. See 28 U.S.C. § 46(d); see also United States v. Wiles, 106 F.3d 1516, 1516 n* (10th Cir. 1997) (noting this court allows remaining panel judges to act as a quorum to resolve an appeal).

## I

In the Spring 2012 term, Pompeo enrolled in an upper-division course at UNM taught by Professor Caroline Hinkley titled "Images of (Wo)men: From Icons to Iconoclasts." The course syllabus states that the class would cover a wide range of themes and that, because students will view sexually explicit material, the course is restricted. Students are advised that there is "controversy built right into the syllabus" and they should expect "perhaps even incendiary class discussions." However, the syllabus further states that students will be expected to act "with respect and care for everybody's marvelously complex subjectivities," and that students who remain in the course agree "to participate with such respect."

As part of the course, students were required to complete response papers discussing the assigned material. The syllabus explains that "[w]ell-developed responses usually 1) refer to the reading, point to several passages, identify a page number; 2) offer a context or summary of what the author is saying; and then 3) pose a question." Hinkley's pedagogical goals for the course were to teach students how "to write a critical and analytic paper," "think critically," and "discern a critical argument from opinions and polemics." Hinkley emphasized to her students that she would "ask them to re-write their papers if they did not satisfy the requirements."

During her enrollment in the course, Pompeo submitted four response papers. She received an A- on her first paper and an A for her second and fourth papers. None of these papers included citations from the required readings. Hinkley stated that she was "very lenient on many of the requirements" in grading papers early in the semester in an effort to encourage students, but would "become more emphatic about citations and [ ] critical authority" as the term progressed.

Pompeo's third response paper, submitted on February 21, 2012, discussed the 1985 film Desert Hearts, which depicts a lesbian romance. In the paper, Pompeo states: "For those uninterested in lesbian romance, the film is likely intolerable to watch in its entirety because there is virtually no other theme in the film; providing no reason for anyone other than lesbians who are unable to discern bad film from good film to endure Desert Hearts." In response to an assigned article describing the women in the film as "gorgeous," Pompeo writes that "their general appearance conjures the cliché, 'you can put lipstick on a pig, but it's still a pig.'" She describes one of the characters as "still sexually vibrant, in spite of her perverse attraction to the same sex" and states that "lesbianism is a very death-like state as far as its inability to reproduce naturally." Describing a scene in which two female characters share a bath, Pompeo writes that the "only signs of potency in the form of the male cock exist in the emasculated body" of one character's fiancé, and portrays the bath water as "essentially drowning out any chance of life considering their fatal attraction to one another." Pompeo states that the film "can be viewed as entirely perverse in its desire and attempt to reverse the natural roles of man and woman in addition to championing the barren wombs of these women."

On March 6, 2012, Hinkley asked Pompeo to meet with her to discuss the paper. Prior to their meeting, Hinkley returned the paper to Pompeo without a grade, but with several handwritten comments. For example, Hinkley wrote: "Oops, Monica—I can assure you that lesbians can discern a good film from a bad one just as any informed straight viewer," and "Why is attraction to the same sex perverse? This

is a strong statement that needs critical backup. Otherwise it's just inflammatory." With respect to Pompeo's discussion of two female characters' "fatal attraction to one another," Hinkley explained that one of the characters was straight. Hinkley also corrected several minor grammatical errors.

Pompeo met with Hinkley on March 20, 2012. Hinkley scheduled the meeting to discuss the ways in which she believed portions of the paper fell short of the standards applicable to critical analysis, specifically, Pompeo's "unsupported generalizations about lesbians." She explained that "inflammatory" or "polemical" statements in particular must be "backed up with critical, authoritative citations and sources." Hinkley felt that the paper merely stated opinions rather than critically stating and developing an argument, and that Pompeo was "critiquing lesbians," not the film. Rather than grade the paper poorly, Hinkley gave Pompeo an opportunity to rewrite it. After Pompeo stated that Desert Hearts was unendurable, Hinkley responded that the class would view other similar films that Pompeo would likely find unendurable as well. Toward the end of their meeting, Hinkley became "alarmed" when Pompeo veered away from the subject at hand and shared details of her personal sexual history and preferences. She described the meeting as ending in a standstill. Hinkley was not sure whether Pompeo wanted to rewrite the paper.

Pompeo states that Hinkley was emotional during the meeting, accused Pompeo of using "hate speech," and said "that it was in [Pompeo's] best interest not to return to her class." However, Pompeo also avers that Hinkley suggested she write a paper on another film and indicated that she would probably receive a good grade. Pompeo characterized her "status" in the class following the meeting as "unresolved."

It is undisputed that Pompeo attended the next class, which occurred just after the meeting. Hinkley states that Pompeo was particularly disruptive in that class but had been disruptive throughout the semester. She states that Pompeo was generally domineering during classroom discussions, spoke out of turn, and interrupted other students. In the class after their meeting, Pompeo strayed from the course materials, engaging in a lengthy rant about Elizabeth Edwards and discussing Tony Curtis' sexuality. Concerned with the "disruptive situation," Hinkley asked Cinematic Arts Department Chair Susan Dever to visit the class, which she did. Pompeo asserts that she was made uncomfortable by Dever's presence and felt like she was being monitored because of the statements made in her paper.

The day after the March 20 meeting, Pompeo tried unsuccessfully to meet with Hinkley again. On March 22, Pompeo met with UNM Provost Jane Slaughter. The same day, Associate Dean Holly Barnet-Sanchez directed Pompeo to address her concerns to Dever. Pompeo met with Dever and Assistant Professor James Stone on March 23. At that meeting, Dever and Stone told Pompeo that her use of the words "barren" and "cock" were not appropriate. Dever also conveyed to Pompeo that she had offended Hinkley. According to Dever, during this meeting Pompeo decided to complete the course as an independent study with Dever and was enthusiastic about her decision. But Pompeo states that through this series of meetings "it was clear that I was banned from the Images class because of the perceived views and the language used in my paper." According to Pompeo, she wished to remain in the class, but "understood that [she] would ... not be allowed back in the

Images classroom" and had no choice but to complete the independent study.

In an email from Dever to Pompeo dated March 26, Dever wrote that she looked forward to completing an independent study program with Pompeo in lieu of the Images class. She stated: "As we agreed, given our thorough review of the ungraded paper, we'll chalk that up to a learning experience that will not feature in your final portfolio." Dever offered several pieces of writing advice, including that "[p]ositing a thesis, rather than stating an opinion" would strengthen Pompeo's work. She also thanked Pompeo for her "willingness to enter into these and other conversations with great openness on Friday." Finally, Dever stated in closing that Pompeo had the right to speak with Barnet-Sanchez if she wished to do so.

On March 29, Pompeo responded by email that she would like to meet again and may want to speak with Barnet-Sanchez. She wrote that she felt like she had "done something wrong" and had "been quietly removed from the classroom." Dever responded that she would be happy to talk and that Pompeo could visit with Barnet-Sanchez if she preferred. Pompeo wrote back indicating that she would like to talk with Dever by phone and had decided what she wanted to do. Apparently after a phone conversation, Pompeo wrote to Dever, "You're too good at what you do. Thank you some more!" The two scheduled another independent study meeting for April 5.

On April 6, Dever wrote to Pompeo to recap their meeting. As reflected in the email, Dever agreed during the meeting that Pompeo would revise and resubmit her Desert Hearts paper, rather than write on another topic. Dever believed that, in doing so, Pompeo had "chosen the hardest road," but stated she would support Pompeo either way. She asked Pom-

peo to submit a new draft by April 10 and advised her to keep in mind that she was writing for an academic audience. She suggested that Pompeo reconsider some word choices, including "perverse," which "is opinion and just muddies another point the essay seems to be making," and "barren," which "has been used historically to punish and degrade women."

Pompeo responded that she would "probably use the word 'BARREN'" and does not "like to be told what words [she] may and may not use, ever." Dever replied that Pompeo could use whatever words she chose, "but after so much conversation about the word [barren], we know that ... choices have consequences." As to Pompeo's statement that she did not like being told what words to use, Dever explained that she was "in the business of trying to help students learn to write unassailable essays ... that speak to a general, academic audience with respect."

Pompeo met with Barnet-Sanchez on April 9. Barnet-Sanchez told Pompeo that Hinkley and Dever thought she had been disruptive and disrespectful in class. Pompeo denied that was true. She states that was the first time she was made aware of such a problem. Barnet-Sanchez proposed mediation, but that apparently did not occur.

Despite receiving several extensions, Pompeo never submitted a revised draft of her paper. Dever states that Pompeo eventually abandoned the independent study by failing to submit any essays or otherwise participate. Pompeo avers that she did not abandon the independent study. However, she also states that she "felt like [she] had no choice but to abandon the paper" after meeting with Dever on March 23. Pompeo further indicates that she was unwilling to omit specific words from her paper, and that she understood the "consequences" Dever threatened to be a poor grade or

other academic or non-academic penalties. Pompeo admits that she ultimately withdrew from the course in part because she was unwilling to revise her paper. She also identifies the lack of a grade for her paper and dishonesty from Hinkley and Dever as reasons for her decision to withdraw.

Pompeo later filed a grievance with UNM. The school agreed to refund her tuition for the course. Pompeo then filed suit in state court against Hinkley, Dever, and the UNM Board of Regents. Defendants removed the case to federal court. In her amended complaint, Pompeo asserts a 42 U.S.C. § 1983 claim against the defendants for violation of her First Amendment rights. She seeks a declaratory judgment and damages. The district court denied defendants' motion to dismiss, but later granted their motion for summary judgment. The district court concluded that Hinkley and Dever were entitled to qualified immunity and that the UNM Board of Regents was immune from suit under the Eleventh Amendment. Pompeo timely appealed.[1]

## II

We review the grant of summary judgment de novo. Hobbs ex rel. Hobbs v. Zenderman, 579 F.3d 1171, 1179 (10th Cir. 2009). A party is entitled to summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the movant is entitled to judgment as a matter of law. Id.

### A

To determine whether defendants are entitled to qualified immunity, a court must determine: (1) whether defendants'

conduct violated plaintiff's constitutional rights; and (2) whether the right at issue was clearly established. Gomes v. Wood, 451 F.3d 1122, 1134 (10th Cir. 2006). We have discretion to consider either prong first. Panagoulakos v. Yazzie, 741 F.3d 1126, 1129 (10th Cir. 2013). We exercise that discretion to proceed directly to the clearly established prong.

For the law to be "clearly established," there ordinarily must be a Supreme Court or Tenth Circuit opinion on point, or the clearly established weight of authority from other circuits must point in one direction. Medina v. City & Cty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Mimics, Inc. v. Vill. of Angel Fire, 394 F.3d 836, 842 (10th Cir. 2005) (quotation omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." Cortez v. McCauley, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc).

In conducting our analysis, we must "define the clearly established right at issue on the basis of the specific context of the case." Tolan v. Cotton, —— U.S. ——, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014) (per curiam) (quotations omitted). In other words, we are "not to define clearly established law at a high level of generality." Mullenix v. Luna, —— U.S. ——, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam). Instead, we must ask

---

1. Pompeo does not address the district court's dismissal of her claim against the UNM Board of Regents in her briefing and has thus waived that claim. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived. . . .").

"whether the violative nature of particular conduct is clearly established." Id. (quotation omitted). With the right at issue so formulated, "existing precedent must have placed the statutory or constitutional question beyond debate." Id. (quotation omitted).

The Supreme Court has "stressed that a court must judge the reasonableness of [an action] from the perspective and with the knowledge of the defendant." Kingsley v. Hendrickson, — U.S. ——, 135 S.Ct. 2466, .2474, 192 L.Ed.2d 416 (2015). However, the inquiry is an objective one: "a court must assess whether the right was clearly established against a backdrop of the objective legal reasonableness of the actor's conduct." Gonzales v. Duran, 590 F.3d 855, 860 (10th Cir. 2009). "[S]ubjective good faith or bad faith of government actors is ordinarily irrelevant to the objective inquiry whether a reasonable officer would have realized that his conduct was unlawful." Meyer v. Bd. of Cty. Comm'rs, 482 F.3d 1232, 1242 (10th Cir. 2007). And "defendants' entitlement to qualified immunity[ ] turn[s] on an individual assessment of each defendant's conduct and culpability." Pahls v. Thomas, 718 F.3d 1210, 1233 (10th Cir. 2013).

It is well established that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). However, students' free speech rights are not "coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (quotations and citation omitted). The parties agree that this case involves "school-sponsored speech," which is "speech that a school affirmatively promotes, as opposed to speech that it tolerates." Fleming 298 F.3d at 923 (quotations and alterations omitted). School-sponsored speech includes "activities [that] may fairly be characterized as part of the school curriculum." Hazelwood, 484 U.S. at 271, 108 S.Ct. 562.

"[E]ducators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273, 108 S.Ct. 562. We permit "greater control over" school-sponsored speech "to assure that participants learn whatever lessons the activity is designed to teach." Id. at 271, 108 S.Ct. 562. Educators may also limit speech that is "ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences." Id. It is only when the decision to limit school-sponsored speech "has no valid educational purpose that the First Amendment is so directly and sharply implicated as to require judicial intervention to protect students' constitutional rights." Id. at 273, 108 S.Ct. 562 (quotation, citation, and alteration omitted).

Our court has held that "Hazelwood allows educators to make viewpoint-based decisions about school-sponsored speech." Fleming, 298 F.3d at 926. We reasoned that if school officials "were required to be viewpoint neutral," they "would be required to [publish speech] with inflammatory and divisive statements." Id. at 934; see also Fraser, 478 U.S. at 683, 106 S.Ct. 3159 ("The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board."). In the context of school-sponsored speech, we held that "viewpoint neutrality is neither necessary nor appropriate, as the school is there

responsible for determining the content of the education it provides." Fleming, 298 F.3d at 927 (quotation omitted).

■ We have also equated the question of whether speech is constitutionally protected with the question of whether a school official restricted that speech based on legitimate pedagogical concerns. See Vanderhurst v. Colo. Mountain Coll. Dist., 208 F.3d 908, 914 (10th Cir. 2000). That is, whether an action restricting a plaintiff's school-sponsored speech is "reasonably related to the [school's] legitimate pedagogical interests is the test for determining whether his speech fell within the ambit of First Amendment protection." Id.

Pompeo relies heavily on Axson-Flynn as providing the clearly established law violated by defendants. In that case, an acting student at the University of Utah refused to use swear words in scene assignments. Axson-Flynn, 356 F.3d at 1282. Her professor told her she would have to "get over" her language concerns, and stated that she could "still be a good Mormon and say these words." Id. The professor initially threatened Axson-Flynn with a grade of zero if she refused to swear, but ultimately allowed her to omit language she found offensive from class exercises. Id. At an end of semester review, three college officials told her that her request for a language accommodation was unacceptable and that she should "talk to some other Mormon girls who are good Mormons, who don't have a problem with this." Id. The officials gave Axson-Flynn an ultimatum: "You can choose to continue in the program if you modify your values. If you don't, you can leave." Id. The following semester, after the officials confirmed they would not change their minds, she left the program. Id.

Our Axson-Flynn opinion discusses the standards governing school-sponsored speech claims at some length. We ex-

plained that "schools must be empowered at times to restrict the speech of their students for pedagogical purposes," including "a teacher's ability to penalize a student for disruptive classroom behavior." Id. at 1290. And "schools also routinely require students to express a viewpoint that is not their own in order to teach the students to think critically." Id. Further:

> The school's methodology may not be necessary to the achievement of its goals and it may not even be the most effective means of teaching, but it can still be "reasonably related" to pedagogical concerns. A more stringent standard would effectively give each student veto power over curricular requirements, subjecting the curricular decisions of teachers to the whims of what a particular student does or does not feel like learning on a given day.

Id. at 1292 (emphasis omitted).

The Axson-Flynn opinion extensively quotes a Sixth Circuit decision, Settle v. Dickson County School Board, 53 F.3d 152 (6th Cir. 1995), in which a student sued after her teacher refused her permission to write a paper on the life of Jesus. The court explained that

> teachers, like judges, must daily decide which arguments are relevant, which computations are correct, which analogies are good or bad, and when it is time to stop writing or talking. Grades must be given by teachers in the classroom, just as cases are decided in the courtroom; and to this end teachers, like judges, must direct the content of speech. Teachers may frequently make mistakes in grading and otherwise, just as we do sometimes in deciding cases, but it is the essence of the teacher's responsibility in the classroom to draw lines and make distinctions—in a word to encourage speech germane to the topic at hand and discourage speech unlike-

ly to shed light on the subject. Teachers therefore must be given broad discretion to give grades and conduct class discussion based on the content of speech. Axson-Flynn, 356 F.3d at 1287 (quoting Settle, 53 F.3d at 155-56) (emphasis omitted).

We also relied on a Ninth Circuit case, Brown v. Li, 308 F.3d 939 (9th Cir. 2002), in which a master's thesis committee refused to approve a thesis that contained a "disacknowledgements" section offering "special Fuck You's" to a number of school officials. Id. at 943 (italics omitted). The student sued when officials withheld his degree until he submitted a thesis omitting the section. Id. at 945. We quoted the Ninth Circuit's holding that "the First Amendment does not require an educator to ... approve the work of a student that, in his or her judgment, fails to meet a legitimate academic standard." Axson-Flynn, 356 F.3d at 1288 (quoting Brown, 308 F.3d at 949) (emphasis omitted). The Ninth Circuit further held that the Hazelwood standard applied with equal force at the secondary and college levels, noting that the "[t]he Supreme Court's jurisprudence does not hold that an institution's interest in ... limiting a student's speech to that which is germane to a particular academic assignment diminishes as students age. Indeed, arguably the need for academic discipline and editorial rigor increases as a student's learning progresses." Brown, 308 F.3d at 951 (emphasis omitted).

After citing these cases with approval, we held that "the Hazelwood framework is applicable in a university setting for speech that occurs in a classroom as part of a class curriculum." Axson-Flynn, 356 F.3d at 1289. We formulated the inquiry as whether the school's "decision was reasonably related to legitimate pedagogical concerns," giving "substantial deference to educators' stated pedagogical concerns." Id. at 1290 (quotations omitted).

 Although the pedagogical concern standard is highly deferential, we also held that "we would be abdicating our judicial duty if we failed to investigate whether the educational goal or pedagogical concern was pretextual." Id. at 1292-93 (emphasis omitted). Courts "may override an educator's judgment where the proffered goal or methodology was a sham pretext for an impermissible ulterior motive." Id. at 1293. "So long as the teacher limits speech or grades speech in the classroom in the name of learning and not as a pretext for punishing the student for her race, gender, economic class, religion or political persuasion, the federal courts should not interfere." Id. at 1293 (quoting Settle, 53 F.3d at 155-56). However, "the Supreme Court directed courts not to override a faculty member's professional judgment 'unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'" Id. (quoting Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)). The Axson-Flynn panel concluded that this stringent standard was met, and thus summary judgment was inappropriate because there was "a genuine issue of material fact as to whether Defendants' justification for the script adherence requirement was truly pedagogical or whether it was a pretext for religious discrimination." Id. at 1293.

**B**

Pompeo contends that Axson-Flynn is directly on point. She argues that our case law is settled that "an instructor cannot restrict a student's speech based on the instructor's hostility to the viewpoint expressed in the speech" and "pretextual

explanations for the 'legitimate' reason for the restriction of speech will not pass constitutional muster." We disagree that our prior opinion placed the "constitutional question beyond debate" such that any reasonable official would have understood the conduct at issue in this case was impermissible. Luna, 136 S.Ct. at 308 (quotation omitted).

Pompeo's assertion that a college instructor may not restrict school-sponsored speech based on opposition to the viewpoint expressed in that speech is plainly incorrect. We have squarely held "that Hazelwood allows educators to make viewpoint-based decisions about school-sponsored speech." Fleming, 298 F.3d at 926. The Axson-Flynn opinion expressly notes this rule, 356 F.3d at 1291 (quoting Fleming, 298 F.3d at 926), along with Justice Souter's statement that university "students are inevitably required to support the expression of personally offensive viewpoints in ways that cannot be thought constitutionally objectionable unless one is prepared to deny the University its choice over what to teach," id. (quoting Bd. of Regents v. Southworth, 529 U.S. 217, 242-43, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000) (Souter, J., concurring in the judgment)).

Our circuit jurisprudence "entrusts to educators these decisions that require judgments based on viewpoint." Fleming, 298 F.3d at 928.

We held in Axson-Flynn that a court can overrule an educator's judgment only if "the proffered goal or methodology was a sham pretext for an impermissible ulterior motive," and that religious discrimination is one such impermissible motive. 356 F.3d at 1293. The only analysis offered in our opinion as to what else may constitute an "impermissible ulterior motive" is a quote from a Sixth Circuit case listing "race, gender, economic class, religion or political persuasion." Id. (quoting Settle, 53 F.3d at 155). Notably absent from that list is viewpoint discrimination, necessarily so in light of our holding in Fleming, 298 F.3d at 926.[2] Thus, contrary to Pompeo's assertion, Axson-Flynn did not clearly establish that restrictions imposed on school-sponsored speech which are motivated by opposition to a student's viewpoint are necessarily impermissible. Accordingly, even if we were to accept Pompeo's claim that some of the explanations offered by Hinkley and Dever were intended as cover for their belief that Pompeo's viewpoint was offen-

**2.** Although Pompeo does not argue that defendants were motivated by any of the potentially impermissible factors explicitly identified in this list, we recognize that Pompeo's viewpoint concerns a politically charged topic. However, we do not read Settle's reference to "political persuasion," 53 F.3d at 155, as prohibiting viewpoint discrimination with respect to opinions that cross some threshold of political salience. Instead, it seems that the Sixth Circuit was referring to discrimination based on partisan affiliation. See generally Keyishian, 385 U.S. at 596, 603-10, 87 S.Ct. 675 (holding unconstitutional a requirement that college professors sign a pledge indicating they are not members of the Communist Party).

We highly doubt that a test based on the degree of a viewpoint's political prominence could be practicable. And in Fleming, we spe-

cifically stated that schools retain discretion to bar "inflammatory and divisive statements" in school-sponsored speech. 298 F.3d at 934. Courts are in poor position to second guess every teacher's conclusion that speech used in an assignment was inflammatory rather than merely controversial, or that a student was disruptive rather than simply passionate. Even when a school official errs in making these determinations, our case law does not clearly indicate that a First Amendment violation has occurred. See Axson-Flynn, 356 F.3d at 1287 ("Teachers may frequently make mistakes in grading and otherwise, just as we do sometimes in deciding cases, but it is the essence of the teacher's responsibility in the classroom to draw lines and make distinctions ...." (quoting Settle, 53 F.3d at 155-56) (emphasis omitted)).

sive, clearly established law would not put defendants on notice that such conduct is unconstitutional.[3]

This is not to say that viewpoint discrimination in educational settings is always desirable, or even fair. As the Supreme Court has noted, our "Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." Keyishian, 385 U.S. at 603, 87 S.Ct. 675 (quotation and alteration omitted). As a matter of policy, certain forms of viewpoint discrimination are undoubtedly contrary to this ideal. But in the context of school-sponsored speech, we have recognized that courts must "entrust[ ] to educators these decisions that require judgments based on viewpoint." Fleming, 298 F.3d at 928; see also Epperson, 393 U.S. at 104, 89 S.Ct. 266 ("Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."). Regardless of the competing policy goals that might be considered in assessing whether school-sponsored speech should be restricted, Axson-Flynn does not clearly prohibit educators from restricting school-sponsored speech based on viewpoints that they believe are offensive or inflammatory.

### C

Pompeo also contends that defendants' actions were not reasonably related to legitimate pedagogical concerns. Her argument appears to be that because there is evidence that Hinkley and Dever were personally offended by Pompeo's position, the court necessarily cannot conclude that any proffered pedagogical motive for their actions is legitimate. This position requires us to consider whether the pedagogical concern inquiry is objective or subjective. As we explain, infra, our case law is unclear as to the correct approach. However, we need not decide the issue because Hinkley and Dever are entitled to qualified immunity under either standard.

### 1

As a general matter, the qualified immunity analysis looks to whether an official's conduct was objectively reasonable. Gonzales, 590 F.3d at 860. However, we may consider "the defendant's intent when his state of mind is an essential element of the plaintiff's substantive claim." Bruning v. Pixler, 949 F.2d 352, 356 (10th Cir. 1991). In some contexts, a defendant's subjective state of mind may be relevant to a First Amendment claim. See Howards v. McLaughlin, 634 F.3d 1131, 1143 (10th Cir. 2011) ("Even if an

---

**3.** Pompeo suggests that the district court erred by distinguishing Axson-Flynn on the ground that the case concerned religious discrimination. We explained there that "[t]he religious nature of Axson-Flynn's refusal to say the offensive words is not determinative of our disposition of her free speech claim" because the "Supreme Court has never held that religious speech is entitled to more protection than nonreligious speech." Axson-Flynn, 356 F.3d at 1292 n.13 (emphasis omitted).

But the religious element of Axson-Flynn is nevertheless important. The plaintiff in that case prevailed on appeal because we conclud-

ed a material dispute existed as to whether the defendants' attempt to compel her to speak objectionable phrases "was truly pedagogical or whether it was a pretext for religious discrimination." Id. at 1293. Thus, even though the plaintiff's religious motivation for objecting to the compelled speech was irrelevant, the defendants' potential hostility to the plaintiff's religion was key. Pompeo attempts to analogize hostility to her viewpoint to the religious discrimination claimed in Axson-Flynn, but that analogy fails because educators are not prohibited from engaging in viewpoint discrimination under Fleming.

official's action would be unexceptionable if taken on other grounds, when retaliation against Constitutionally-protected speech is the but-for cause of that action, this retaliation is actionable and subject to recovery." (quotations omitted)), rev'd Reichle v. Howards, 566 U.S. 658, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012). But the rule stated in Howards, to the extent it remains viable, merely begs the question in this case.

 To state a First Amendment retaliation claim, a plaintiff must show that the defendant reacted to protected speech. Id. And in Vanderhurst, we held that the legitimate pedagogical interest inquiry determines whether speech is constitutionally protected. 208 F.3d at 914. We concluded that a college was "incorrect to bifurcate as separate arguments (1) that Vanderhurst's speech was not constitutionally protected, and (2) that his termination was reasonably related to the College's legitimate pedagogical concerns." Id. Instead, we ruled that "whether Vanderhurst's termination reasonably related to the College's legitimate pedagogical interests is the test for determining whether his speech fell within the ambit of First Amendment protection." Id. We further stated that in assessing the asserted pedagogical interests, the question is not whether an action taken by school officials "was a reasonable one" because "a federal court should play no role in judging the reasonableness of the sanctions which a school levies." Id. at 916 n.5. Instead, courts must ask whether the "conduct prompting the sanction, as perceived in

good faith by the school, in some way violated or vitiated ... legitimate pedagogical concerns." Id. Thus, under Vanderhurst, it appears a court must first conclude that a plaintiff's speech was constitutionally protected (in that actions restricting the speech were not related to pedagogical concerns) before considering whether a school official acted with subjective animus.[4]

In light of this precedent, we agree with the district court that it is unclear if courts should ask whether a defendant's actions were subjectively retaliatory or whether the retaliatory actions were objectively unrelated to a pedagogical goal. Nevertheless, under either standard, we conclude that the actions taken by Hinkley and Dever were sufficiently related to pedagogical goals that the claimed unconstitutional nature of their particular conduct was not clearly established. See Luna, 136 S.Ct. at 308.

2

"[T]he 'pedagogical' concept set forth in Hazelwood merely means that the activity is related to learning" and "is by no means confined to the academic for it includes discipline, courtesy, and respect for authority." Corder v. Lewis Palmer Sch. Dist. No. 38, 566 F.3d 1219, 1228 (10th Cir. 2009) (quotations omitted). Several courts "have established that the pedagogical test may be satisfied simply by the school district's desire to avoid controversy within a school environment." Id. at 1228-29 (quotation omitted); see also id. at 1232 (quoting

---

4. Pompeo concedes that Vanderhurst appeared to apply an objective standard but argues its analysis should be limited to the context of school employment decisions. Although that case did consider an action taken by a college in response to a professor's speech, nothing in our case law suggests Vanderhurst is so limited. At the very least, a

reasonable official could not be certain that the test stated in Vanderhurst applied only in the employment context. See generally Reichle, 132 S.Ct. at 2096 (granting qualified immunity because "it was at least arguable that [a rule governing retaliatory prosecution] extended to retaliatory arrests").

out-of-circuit authority for the proposition that "[i]t is well within the parameters of school officials' authority ... to teach civility and sensitivity in the expression of opinions" (alterations in original)). And in Fleming, we held that a school may restrict school-sponsored speech "with inflammatory and divisive statements." 298 F.3d at 934. Similarly, the Supreme Court has held that "schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech." Fraser, 478 U.S. at 683, 106 S.Ct. 3159.

In considering defendants' entitlement to qualified immunity, we must look to their individual actions. See Pahls, 718 F.3d at 1233. Pompeo's complaints about Hinkley focus on their March 20, 2012, meeting. During that meeting, Hinkley chastised Pompeo for using inflammatory language, suggesting it could be considered hate speech, and asked Pompeo to rewrite her paper. Hinkley stated that it was in Pompeo's best interest not to return to class. But Pompeo does not claim to have been expelled from the class by Hinkley. Instead, she describes her status

in the class as "unresolved." It is undisputed that Pompeo attended class after the meeting and that Hinkley lacked the power to expel a student from class.[5] After the meeting, Hinkley asked her superior, Dever, to attend class because she was concerned about Pompeo being disruptive and was unclear about how Pompeo wished to proceed with her Desert Hearts paper. Although Pompeo repeatedly refers to Hinkley's "refusal" to grade the paper, Pompeo does not claim that she actually requested a grade from Hinkley following their March 20 meeting. Hinkley states that she would have graded the paper if Pompeo requested.

From an objective standpoint, Hinkley's actions are related to legitimate pedagogical goals. Criticizing a student's paper, even in harsh terms, and asking her to rewrite it relate to the pedagogical goals of encouraging critical analysis, avoiding unsupported generalizations, and maintaining focus on assigned material rather than a student's general opinions. And requesting a superior attend class to assist with a potentially disruptive student cannot be deemed unreasonable.[6] See Axson-Flynn,

5. Pompeo states that "[d]uring the meetings ... on March 20th, 22nd and 23rd, it was clear that I was banned from the Images class because of the perceived views and the language used in my paper." But she does not identify who made clear to her that she was "banned" or what was said to give her this impression. We have previously explained that § 1983 plaintiffs must "make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." Robbins v. Okla. ex rel. Dep't of Human Servs., 519 F.3d 1242, 1250 (10th Cir. 2008). Without any "distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed." Id.; see also Pahls, 718 F.3d at 1226 ("[I]t is incum-

bent upon a plaintiff to identify specific actions taken by particular defendants in order to make out a viable § 1983 or Bivens claim." (quotation and emphasis omitted)).

6. Pompeo states in her affidavit that she was not disruptive in class. But we must judge the reasonableness of an action from the defendant's perspective. Kingsley, 135 S.Ct. at 2474. A plaintiff's subjective evaluation of her own performance is of little value. See generally Kelley v. Goodyear Tire & Rubber Co., 220 F.3d 1174, 1178 (10th Cir. 2000). Pompeo states that she understood the class syllabus to "allow passionate debate" and "controversy." Whether she viewed her passionate class commentary as disruptive does not tell us whether Hinkley did so. To the extent that Pompeo argues that defendants' conduct was inconsistent with the course syllabus and materials, the Supreme Court has squarely re-

356 F.3d at 1290 (holding that teachers may restrict speech to "penalize a student for disruptive classroom behavior").

■ Even if the proper test considers a defendant's subjective state of mind, we conclude that Hinkley must be granted qualified immunity. Pompeo argues that the foregoing pedagogical goals were mere pretext, and that Hinkley actually engaged in these actions because she subjectively took offense to statements in Pompeo's paper. But as discussed supra, clearly established law does not prohibit a school official from restricting statements the educator finds "inflammatory and divisive" in school-sponsored speech. Fleming, 298 F.3d at 934. At the very least, Hinkley's actions are reasonably related to her subjective conclusion that Pompeo's statements were inflammatory. See id. at 933 (declining to consider one proffered pedagogical interest because second interest was valid). Teaching students to avoid inflammatory language when writing for an academic audience qualifies as a legitimate pedagogical goal. Corder, 566 F.3d at 1228 (pedagogical concerns include "discipline, courtesy, and respect for authority").

■ We reach the same conclusion as to Dever. Pompeo claims that Dever scolded her at the March 23 meeting, telling her that use of the word "barren" was offensive, and that Dever conveyed to Pompeo that she was "a disgrace."[7] Pompeo further contends that Dever threatened her with consequences, which she took to mean a poor grade, if she persisted

in using the word "barren" in a revised paper. The email exchange in which Dever makes this comment is included in the record. Following Pompeo's statement that she will likely use the term "barren," Dever states that the term "has been used historically to punish and degrade women." And in response to Pompeo's statement that she did not "like to be told what words I may and may not use, ever," Dever explains that her role is to teach students to write essays "that speak to a general, academic audience with respect." She states that word choice is ultimately up to Pompeo, but that her "choices have consequences."

■ As with Hinkley, even if we conduct a subjective inquiry, we conclude that Dever is entitled to qualified immunity. Dever's challenged actions are reasonably related to the legitimate pedagogical goal of deterring students from using words in a class assignment that the teacher subjectively finds inappropriate. See Axson-Flynn, 356 F.3d at 1292 ("The school's methodology may not be necessary to the achievement of its goals and it may not even be the most effective means of teaching, but it can still be 'reasonably related' to pedagogical concerns." (emphasis omitted)). Our case law does not suggest that federal courts are in the business of determining whether a term is actually inappropriate for an academic audience, to the extent appropriateness can be objectively defined. Short of turning every classroom into a courtroom, we must "entrust[ ] to

---

jected the proposition that school officials may only restrict speech "pursuant to specific written regulations" because such a requirement "could unduly constrain the ability of educators to educate." Hazelwood, 484 U.S. at 273 n.6, 108 S.Ct. 562.

7. Pompeo states that she "was given no choice other than to take the independent study course with" Dever. But she does not

indicate whether Dever personally said or did something in particular to convey that the independent study was mandatory. See Pahls, 718 F.3d at 1225-26 ("When various officials have taken different actions with respect to a plaintiff, the plaintiff's facile, passive-voice showing that his rights 'were violated' will not suffice."). Dever also lacked authority to expel a student from class.

educators these decisions that require judgments based on viewpoint." See Fleming, 298 F.3d at 928.

## III

In assessing defendants' claims of qualified immunity, we are mindful of the Supreme Court's admonition to "define the clearly established right at issue on the basis of the specific context of the case." Tolan, 134 S.Ct. at 1866 (quotations omitted). Pompeo claims a right to use language in a course assignment that her professors found to be inflammatory without being criticized or pressured to make revisions. Because we conclude that such a right is not clearly established, the district court's grant of summary judgment in favor of defendants is **AFFIRMED**.

